**No. 25-1964**

# United States Court of Appeals for the Seventh Circuit

TAEWOO KIM, et al.,

*Plaintiffs-Appellees*,

v.

JUMP TRADING, LLC, et al.,

*Defendants-Appellants*.

Appeal from the United States District Court for the Northern District of Illinois
Case No. 1:23-cv-02921 (Georgia N. Alexakis, District Court Judge)

**OPENING BRIEF AND REQUIRED SHORT APPENDIX FOR DEFENDANTS-APPELLANTS**


Roman Martinez
Melissa Arbus Sherry
David Steinbach
Uriel Hinberg
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Peter Trombly
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Jonathan D. Cogan
*Counsel of Record*
Steven W. Perlstein
Igor Margulyan
KOBRE & KIM LLP
800 Third Avenue
Sixth Floor
New York, NY 10022
(212) 488-1200

*Counsel for Defendants-Appellants Jump Trading, LLC and Jump Crypto Holdings LLC*
*(Additional counsel on inside cover)*


August 13, 2025

Aitan D. Goelman
*Counsel of Record*
R. Miles Clark
Christopher R. MacColl
ZUCKERMAN SPAEDER LLP
2100 L Street, NW
Suite 400
Washington, DC 20037
(212) 778-1800

*Counsel for Defendant-Appellant Kanav Kariya*

Paul M. Krieger
*Counsel of Record*
Jonathan F. Bolz
KKL LLP
350 Fifth Avenue
Suite 7710
New York, NY 10118
(212) 390-9550

*Counsel for Defendant-Appellant William DiSomma*

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jump Trading, LLC; Jump Crypto Holdings LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kobre & Kim LLP; Latham & Watkins LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Jump Trading, LLC is wholly owned by Jump Trading Holdings, LLC. Jump Crypto Holdings LLC is owned by DYSO TC, LLC and PXG, LLC.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No public company owns 10% or more of Jump Trading, LLC's stock or Jump Crypto Holdings LLC's stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Jonathan D. Cogan Date: 08/13/2025

Attorney's Printed Name: Jonathan D. Cogan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☒ **No** ☐

Address: Kobre & Kim LLP

800 Third Avenue, Sixth Floor, New York, NY 10022

Phone Number: (212) 488-7700 Fax Number: (212) 488-1220

E-Mail Address: jonathan.cogan@kobrekim.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jump Trading, LLC; Jump Crypto Holdings LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kobre & Kim LLP; Latham & Watkins LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Jump Trading, LLC is wholly owned by Jump Trading Holdings, LLC. Jump Crypto Holdings LLC is owned by DYSO TC, LLC and PXG, LLC.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No public company owns 10% or more of Jump Trading, LLC's stock or Jump Crypto Holdings LLC's stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Steven W. Perlstein Date: 08/13/2025

Attorney's Printed Name: Steven W. Perlstein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Kobre & Kim LLP

800 Third Avenue, Sixth Floor, New York, NY 10022

Phone Number: (212) 488-7700 Fax Number: (212) 488-1220

E-Mail Address: steven.perlstein@kobrekim.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jump Trading, LLC; Jump Crypto Holdings LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kobre & Kim LLP; Latham & Watkins LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Jump Trading, LLC is wholly owned by Jump Trading Holdings, LLC. Jump Crypto Holdings LLC is owned by DYSO TC, LLC and PXG, LLC.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No public company owns 10% or more of Jump Trading, LLC's stock or Jump Crypto Holdings LLC's stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Igor Margulyan Date: 08/13/2025

Attorney's Printed Name: Igor Margulyan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Kobre & Kim LLP

800 Third Avenue, Sixth Floor, New York, NY 10022

Phone Number: (212) 488-7700 Fax Number: (212) 488-1220

E-Mail Address: igor.margulyan@kobrekim.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jump Trading, LLC; Jump Crypto Holdings LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kobre & Kim LLP; Latham & Watkins LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Jump Trading, LLC is wholly owned by Jump Trading Holdings, LLC. Jump Crypto Holdings LLC is owned by DYSO TC, LLC and PXG, LLC.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No public company owns 10% or more of Jump Trading, LLC's stock or Jump Crypto Holdings LLC's stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Roman Martinez Date: 08/13/2025

Attorney's Printed Name: Roman Martinez

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Latham & Watkins LLP

555 Eleventh Street, NW, Suite 1000, Washington, DC 20004

Phone Number: (202) 637-2200 Fax Number: (202) 637-2201

E-Mail Address: roman.martinez@lw.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jump Trading, LLC; Jump Crypto Holdings LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kobre & Kim LLP; Latham & Watkins LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Jump Trading, LLC is wholly owned by Jump Trading Holdings, LLC. Jump Crypto Holdings LLC is owned by DYSO TC, LLC and PXG, LLC.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No public company owns 10% or more of Jump Trading, LLC's stock or Jump Crypto Holdings LLC's stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Melissa Arbus Sherry Date: 08/13/2025

Attorney's Printed Name: Melissa Arbus Sherry

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Latham & Watkins LLP

555 Eleventh Street, NW, Suite 1000, Washington, DC 20004

Phone Number: (202) 637-2200 Fax Number: (202) 637-2201

E-Mail Address: melissa.sherry@lw.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jump Trading, LLC; Jump Crypto Holdings LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kobre & Kim LLP; Latham & Watkins LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Jump Trading, LLC is wholly owned by Jump Trading Holdings, LLC. Jump Crypto Holdings LLC is owned by DYSO TC, LLC and PXG, LLC.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No public company owns 10% or more of Jump Trading, LLC's stock or Jump Crypto Holdings LLC's stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ David Steinbach Date: 08/13/2025

Attorney's Printed Name: David Steinbach

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Latham & Watkins LLP

555 Eleventh Street, NW, Suite 1000, Washington, DC 20004

Phone Number: (202) 637-2200 Fax Number: (202) 637-2201

E-Mail Address: david.steinbach@lw.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jump Trading, LLC; Jump Crypto Holdings LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kobre & Kim LLP; Latham & Watkins LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Jump Trading, LLC is wholly owned by Jump Trading Holdings, LLC. Jump Crypto Holdings LLC is owned by DYSO TC, LLC and PXG, LLC.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No public company owns 10% or more of Jump Trading, LLC's stock or Jump Crypto Holdings LLC's stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Uriel Hinberg Date: 08/13/2025

Attorney's Printed Name: Uriel Hinberg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Latham & Watkins LLP

555 Eleventh Street, NW, Suite 1000, Washington, DC 20004

Phone Number: (202) 637-2200 Fax Number: (202) 637-2201

E-Mail Address: uriel.hinberg@lw.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Jump Trading, LLC; Jump Crypto Holdings LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kobre & Kim LLP; Latham & Watkins LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

Jump Trading, LLC is wholly owned by Jump Trading Holdings, LLC. Jump Crypto Holdings LLC is owned by DYSO TC, LLC and PXG, LLC.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

No public company owns 10% or more of Jump Trading, LLC's stock or Jump Crypto Holdings LLC's stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Peter Trombly Date: 08/13/2025

Attorney's Printed Name: Peter Trombly

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Latham & Watkins LLP

1271 Avenue of the Americas, New York, NY 10020

Phone Number: (212) 906-1200 Fax Number: (212) 751-4864

E-Mail Address: peter.tromby@lw.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Kanav Kariya

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Zuckerman Spaeder LLP; Croke Fairchild Duarte & Beres LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Aitan D. Goelman Date: 08/13/2025

Attorney's Printed Name: Aitan D. Goelman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☒ **No** ☐

Address: Zuckerman Spaeder LLP

2100 L Street, NW, Suite 400, Washington, DC 20037

Phone Number: (202) 778-1800 Fax Number: (202) 822-8106

E-Mail Address: agoelman@zuckerman.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Kanav Kariya

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Zuckerman Spaeder LLP; Croke Fairchild Duarte & Beres LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ R. Miles Clark Date: 08/13/2025

Attorney's Printed Name: R. Miles Clark

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Zuckerman Spaeder LLP

2100 L Street, NW, Suite 400, Washington, DC 20037

Phone Number: (202) 778-1800 Fax Number: (202) 822-8106

E-Mail Address: rclark@zuckerman.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Kanav Kariya

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Zuckerman Spaeder LLP; Croke Fairchild Duarte & Beres LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Christopher R. MacColl Date: 08/13/2025

Attorney's Printed Name: Christopher R. MacColl

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: Zuckerman Spaeder LLP

2100 L Street, NW, Suite 400, Washington, DC 20037

Phone Number: (202) 778-1800 Fax Number: (202) 822-8106

E-Mail Address: cmaccoll@zuckerman.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

William DiSomma

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

KKL LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Paul M. Krieger Date: 08/13/2025

Attorney's Printed Name: Paul M. Krieger

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☒ **No** ☐

Address: KKL LLP

350 Fifth Avenue, Suite 7710, New York, NY 10118

Phone Number: (212) 390-9552 Fax Number: (212) 390-9552

E-Mail Address: paul.krieger@kklllp.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1964

Short Caption: Taewoo Kim, et al v. Jump Trading, LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

William DiSomma

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

KKL LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Jonathan F. Bolz Date: 08/13/2025

Attorney's Printed Name: Jonathan F. Bolz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☒

Address: KKL LLP

350 Fifth Avenue, Suite 7710, New York, NY 10118

Phone Number: (212) 390-9553 Fax Number: (212) 390-9553

E-Mail Address: jonathan.bolz@kklllp.com

## TABLE OF CONTENTS


**Page**

APPEARANCES & CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ................ i

TABLE OF AUTHORITIES ........................................................................ xvi

STATEMENT OF JURISDICTION ............................................................ 1

ISSUES PRESENTED .............................................................................. 2

INTRODUCTION ...................................................................................... 2

STATEMENT OF THE CASE .................................................................... 7

A. The Rise And Fall Of The Terra Blockchain And The Anchor Protocol ........................................................................................ 8

B. Plaintiffs' Lawsuit And Defendants' Motion To Compel Arbitration ................................................................................ 11

C. The District Court's Order ................................................................ 14

STANDARD OF REVIEW ........................................................................ 16

SUMMARY OF ARGUMENT .................................................................. 16

ARGUMENT ............................................................................................ 19

I. THE ARBITRATOR MUST DECIDE WHETHER A NONSIGNATORY MAY ENFORCE THE ARBITRATION AGREEMENT AGAINST PLAINTIFFS ............................................................................................ 19

A. The Anchor TOS Clearly And Unmistakably Delegate To The Arbitrator Whether Defendants Can Enforce The Arbitration Agreement ............................................................................ 19

1. The TOS's Delegation Clause Clearly And Unmistakably Delegates The Arbitrability Question Of Nonsignatory Enforcement To The Arbitrator ............................................ 21

2. The TOS's Incorporation Of The SIAC Rules Reinforces That Whether A Nonsignatory Can Enforce The Agreement Is For The Arbitrator To Decide ............................ 22

B. The District Court Erred By Deciding The Question Of Nonsignatory Enforcement ............................................................ 26

**Page**


II. EQUITABLE ESTOPPEL ENTITLES DEFENDANTS TO COMPEL ARBITRATION OF PLAINTIFFS' CLAIMS ..... 34

A. The New York Convention Governs The Arbitration Agreement ..... 34

B. Federal Common Law Supplies The Applicable Equitable-Estoppel Standard ..... 37

C. Under The Federal Common Law Test For Equitable Estoppel, Plaintiffs' Claims Must Be Arbitrated ..... 44

CONCLUSION ..... 51

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Aggarao v. MOL Ship Management Co.*,
675 F.3d 355 (4th Cir. 2012) .......... 44, 45, 47

*Ambrosia Land Investments, LLC v. Peabody Coal Co.*,
521 F.3d 778 (7th Cir. 2008) .......... 44

*Anderton v. Practice-Monroeville, P.C.*,
164 So. 3d 1094 (Ala. 2014) .......... 24

*Apollo Computer, Inc. v. Berg*,
886 F.2d 469 (1st Cir. 1989) .......... 28

*Arthur Andersen LLP v. Carlisle*,
556 U.S. 624 (2009) .......... *passim*

*Attix v. Carrington Mortgage Services, LLC*,
35 F.4th 1284 (11th Cir. 2022) .......... 21

*Becker v. Delek US Energy, Inc.*,
39 F.4th 351 (6th Cir. 2022) .......... 21, 27, 28, 31

*Blanton v. Domino's Pizza Franchising LLC*,
962 F.3d 842 (6th Cir. 2020) .......... 23, 24, 28

*Blisset v. Blisset*,
526 N.E.2d 125 (Ill. 1988) .......... 41

*Boyle v. United Technologies Corp.*,
487 U.S. 500 (1988) .......... 37, 39

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .......... 22

*Bufkin Enterprises, L.L.C. v. Indian Harbor Insurance Co.*,
96 F.4th 726 (5th Cir. 2024) .......... 49, 50

*Casa Arena Blanca LLC v. Rainwater*,
No. 21-2037, 2022 WL 839800 (10th Cir. Mar. 22, 2022) .......... 28

*CCC Intelligent Solutions Inc. v. Tractable Inc.*,
36 F.4th 721 (7th Cir. 2022) .......... 5, 26, 31, 32

**Page(s)**

*Certain Underwriters at Lloyd's London v. Argonaut Insurance Co.*,
500 F.3d 571 (7th Cir. 2007) .......... 18, 38, 39, 42

*Coatney v. Ancestry.com DNA, LLC*,
93 F.4th 1014 (7th Cir. 2024) .......... 16

*Commonwealth Edison Co. v. Gulf Oil Corp.*,
541 F.2d 1263 (7th Cir. 1976) .......... 22

*Contec Corp. v. Remote Solution, Co.*,
398 F.3d 205 (2d Cir. 2005) .......... 28

*Cooper Industries, Inc. v. Aviall Services, Inc.*,
543 U.S. 157 (2004) .......... 33

*Damato v. Hermanson*,
153 F.3d 464 (7th Cir. 1998) .......... 48

*Dirth v. Oak Street Health, Inc.*,
No. 24 C 5290, 2025 WL 524142 (N.D. Ill. Feb. 18, 2025) .......... 23

*Eckert/Wordell Architects, Inc. v. FJM Properties of Willmar, LLC*,
756 F.3d 1098 (8th Cir. 2014) .......... 24, 28

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) .......... 24

*Gannon International, Ltd. v. Blocker*,
No. 4:10CV0835, 2011 WL 111885 (E.D. Mo. Jan. 13, 2011) .......... 23

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
590 U.S. 432 (2020) .......... 27, 34, 42

*Gore v. Alltel Communications, LLC*,
666 F.3d 1027 (7th Cir. 2012) .......... 48

*Granite Rock Co. v. International Brotherhood of Teamsters*,
561 U.S. 287 (2010) .......... 20, 27

*Grigson v. Creative Artists Agency L.L.C.*,
210 F.3d 524 (5th Cir. 2000) .......... 46, 50

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .......... 19, 20

**Page(s)**

*Herrera v. Cathay Pacific Airways Ltd.*,
104 F.4th 702 (9th Cir. 2024) .......... 41

*Hoffman v. Deloitte & Touche, LLP*,
143 F. Supp. 2d 995 (N.D. Ill. 2001) .......... 45

*Holden v. Deloitte & Touche LLP*,
390 F. Supp. 2d 752 (N.D. Ill. 2005) .......... 45, 46

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002) .......... 4, 20, 21, 28, 30

*InterGen N.V. v. Grina*,
344 F.3d 134 (1st Cir. 2003) .......... 40

*International Paper Co. v. Shwabedissen Maschinen & Anlagen GMBH*,
206 F.3d 411 (4th Cir. 2000) .......... 40

*Jain v. de Méré*,
51 F.3d 686 (7th Cir. 1995) .......... 35

*Janiga v. Questar Cap. Corp.*,
615 F.3d 735 (7th Cir. 2010) .......... 21

*K.F.C. v. Snap Inc.*,
29 F.4th 835 (7th Cir. 2022) .......... 19, 20, 30

*Kelly v. K12 Inc.*,
854 F. App'x 963 (10th Cir. 2021) .......... 45

*Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*,
174 F.3d 907 (7th Cir. 1999) .......... 47, 48

*Leff v. Deutsche Bank AG*,
No. 08-CV-733, 2009 WL 1380819 (N.D. Ill. May 14, 2009) .......... 45

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) .......... 30

*MouseBelt Labs Pte. Ltd. v. Armstrong*,
674 F. Supp. 3d. 728 (N.D. Cal. 2023) .......... 43

**Page(s)**

*MS Dealer Serv. Corp. v. Franklin*,
177 F.3d 942 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009) ............................*passim*

*Newman v. Plains All American Pipeline, L.P.*,
23 F.4th 393 (5th Cir. 2022)........................................................................ 29, 30

*Newman v. Plains All American Pipeline, L.P.*,
44 F.4th 251 (5th Cir. 2022)........................................................................ 29

*Oracle America, Inc. v. Myriad Group A.G.*,
724 F.3d 1069 (9th Cir. 2013) ...................................................................... 23

*Orgone Capital III, LLC v. Daubenspeck*,
912 F.3d 1039 (7th Cir. 2019) ...................................................................... 14

*Outokumpu Stainless USA, LLC v. Coverteam SAS*,
No. 17-10944, 2022 WL 2643936 (11th Cir. July 8, 2022)................. 37, 38, 39, 42

*Patterson v. Jump Trading LLC*,
710 F. Supp. 3d 692 (N.D. Cal. 2024), *aff'd*, Nos. 24-670, 24-2489, 2025 WL 215519 (9th Cir. Jan. 16, 2025), *pet. for cert. filed*, No. 24-1266 (June 10, 2025) ......................................................................... 36

*Patterson v. Jump Trading, LLC*,
Nos. 24-670, 24-2489, 2025 WL 215519 (9th Cir. Jan. 16, 2025) ......................... 29

*Pilot Inc. v. Tyc Brother Industrial Co.*,
No. 2:20-cv-02978, 2020 WL 3833597 (C.D. Cal. July 8, 2020) ............................ 23

*R.R. Donnelley & Sons Co. v. FTC*,
931 F.2d 430 (7th Cir. 1991) ........................................................................ 33

*Reeves v. Enterprise Products Partners, LP*,
17 F.4th 1008 (10th Cir. 2021)...................................................................... 41

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) ....................................................................................... 20

*Rogers v. Tug Hill Operating, LLC*,
76 F.4th 279 (4th Cir. 2023)......................................................................... 29

*Scherk v. Alberto-Culver Co.*,
417 U.S. 506 (1974) ..................................................................................... 38

**Page(s)**

*Setty v. Shrinivas Sugandhalaya LLP*,
3 F.4th 1166 (9th Cir. 2021) ........ 40, 42

*Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration International, Inc.*,
198 F.3d 88 (2d Cir. 1999), *abrogated on other grounds by Granite Rock*, 561 U.S. 287 (2010) ........ 40

*Sosa v. Onfido, Inc.*,
8 F.4th 631 (7th Cir. 2021) ........ 13, 15, 16, 42, 45

*Tatum v. Legg Mason Wood Walker, Inc.*,
83 F.3d 121 (5th Cir. 1996) ........ 48

*Teledyne Technologies Inc. v. Shekar*,
831 F.3d 936 (7th Cir. 2016) ........ 33

*Tsareff v. ManWeb Services, Inc.*,
794 F.3d 841 (7th Cir. 2015) ........ 16

*Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*,
51 F.Supp.3d 713 (N.D. Ill. 2014) ........ 23

*Wallrich v. Samsung Electronics America, Inc.*,
106 F.4th 609 (7th Cir. 2024) ........ 10, 22

*Welborn Clinic v. MedQuist, Inc.*,
301 F.3d 634 (7th Cir. 2002) ........ 48

*Zirpoli v. Midland Funding, LLC*,
48 F.4th 136 (3d Cir. 2022) ........ 27, 28

## STATUTES AND REGULATIONS

7 U.S.C. § 2 et seq. ........ 11

7 U.S.C. § 25(c) ........ 1

9 U.S.C. § 16(a) ........ 1

9 U.S.C. § 202 ........ 18, 35

9 U.S.C. § 203 ........ 1

28 U.S.C. § 1331 ........ 1

**Page(s)**

28 U.S.C. § 1367(a) .................................................................................... 1

17 C.F.R. § 180.1 ........................................................................................ 11

17 C.F.R. § 180.2 ........................................................................................ 11


## OTHER AUTHORITIES

Arbitration Rules of the Singapore International Arbitration Centre (6th ed. 2016), https://siac.org.sg/siac-rules-2016 ................................................ 25

Aribitration Rules of the Singapore International Arbitration Centre (7th ed. 2025), https://siac.org.sg/siac-rules-2025 ........................................*passim*

*Black's Law Dictionary* (12th ed. 2024) ............................................................ 21, 25

*Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/scope (last visited Aug. 6, 2025) .......................................................................................... 24

Fed. R. App. P. 4(a)(1)(A) .................................................................................. 2

Fed. R. Civ. P. 56(c)(1)(A) ................................................................................ 10

*Oxford English Dictionary*, https://doi.org/10.1093/OED/1087911741 (updated Mar. 2024) ........................................................................................ 8

21 Williston on Contracts (4th ed. 2001) ............................................................ 27

21 Williston on Contracts (4th ed. 2025, update) ................................................ 45

## STATEMENT OF JURISDICTION

Plaintiffs-Appellees Taewoo Kim, Kashyap Patel, Kerry Woolley, and Ken Worsham ("Plaintiffs") brought a putative class action against Defendants-Appellants Jump Trading, LLC, Jump Crypto Holdings LLC, William DiSomma, and Kanav Kariya ("Defendants"), seeking damages and injunctive relief under the Commodity Exchange Act ("CEA") and the common law of unjust enrichment. A37-80. This appeal arises from the district court's denial of Defendants' motion to compel arbitration of Plaintiffs' claims. A1-19.

The district court had subject matter jurisdiction over the underlying federal claims under 7 U.S.C. § 25(c) and 28 U.S.C. § 1331.[1] The district court had supplemental jurisdiction over the state-law unjust enrichment claim because that claim is based on many of the same operative facts and is thus "so related to [the federal claims] that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

This Court has appellate jurisdiction under Section 16(a) of the Federal Arbitration Act ("FAA"), which permits immediate appeals from denials of motions to compel arbitration. 9 U.S.C. § 16(a).

The district court entered its order denying the motion to compel arbitration on May 9, 2025, A1-19, and Defendants filed a notice of appeal on June 3, 2025. A36.

---

[1] Because Defendants believe that the arbitration agreement at issue in this case is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Defendants also believe that the district court had subject matter jurisdiction under 9 U.S.C. § 203.

Accordingly, this appeal was timely under Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

## ISSUES PRESENTED

1. Whether the Anchor Protocol Terms of Service's broad delegation provision and incorporation of the Arbitration Rules of the Singapore International Arbitration Centre require that an arbitrator, rather than a court, decide whether a nonsignatory can enforce the arbitration agreement.

2. Whether the federal common law doctrine of equitable estoppel applies and requires arbitration of Plaintiffs' claims because they rest on allegations of substantially interdependent and concerted misconduct by nonsignatories and a signatory.

## INTRODUCTION

This case raises questions of far-reaching importance regarding the third-party enforcement of arbitration agreements. In the decision below, the district court recognized that the contract at issue clearly and unmistakably delegated questions of arbitrability to an arbitrator, but nevertheless held that a court must decide whether an arbitration agreement may be enforced by a nonsignatory because, the court believed, it is a question of contract formation. That holding cannot be squared with basic principles of federal arbitration law. If upheld, it would put this Court on the wrong side of an entrenched circuit split. The decision below should be reversed, so that an arbitrator can resolve the dispute about nonsignatory enforcement.

In this case, Plaintiffs purchased a digital asset known as Terra USD ("UST") on a blockchain created by a Singaporean company, Terraform Labs Pte. Ltd. ("TFL"),

and its South Korean co-founder, Do Kwon. UST was supposed to be a "stablecoin" with a value of $1 (U.S.). But TFL also told UST holders that by depositing UST on the Anchor Protocol, a software program on TFL's blockchain, they could receive 20% interest on their UST. To deposit UST on the Anchor Protocol—as each Plaintiff did here—users had to agree to the Anchor Terms of Service ("TOS"), which broadly require users to arbitrate "[a]ny claim or controversy arising out of or relating to" (1) "the Interface" (*i.e.*, the web application through which users access the Anchor Protocol); (2) "this Agreement"; or (3) "any other acts or omissions for which you may contend that [TFL is] liable." A154 (§ 18). The TOS also require users to arbitrate "any claim or controversy as to arbitrability." *Id.*

The key to maintaining the value of UST and the Anchor Protocol's promised returns was an algorithm designed to regulate UST's price. But that algorithm allegedly faltered in May 2021 and finally collapsed in May 2022, wiping out the value of Plaintiffs' UST holdings. Plaintiffs then filed this action asserting that Defendants—Jump Trading, LLC (a registered U.S. broker-dealer that engages in the proprietary trading of traditional financial instruments), Jump Crypto Holdings LLC (a holding company for Jump Trading Group's digital asset division), Jump Trading Group's co-founder, and the digital asset division's then-president and former director of strategic initiatives—"secretly schemed" and "colluded" with TFL and Do Kwon to "artificially inflate" both UST's price and the value of deposits on the Anchor Protocol in May 2021. And Plaintiffs alleged Defendants were therefore liable

under the Commodity Exchange Act and common law prohibitions on unjust enrichment.

Defendants moved to compel arbitration based on the TOS's broad arbitration clause. Although Defendants were not signatories to the arbitration agreement, they asserted a right to compel arbitration of Plaintiffs' claims under the doctrine of equitable estoppel, which authorizes nonsignatory enforcement when the plaintiff alleges that a nonsignatory engaged in concerted misconduct with a signatory. Defendants further argued that the arbitration agreement's broad delegation clause requires an arbitrator—not the court—to resolve their equitable-estoppel argument. Notwithstanding express language in the TOS committing issues of arbitrability to the arbitrator, the district court decided for itself that equitable estoppel did not require arbitration of Plaintiffs' claims.

That decision was flawed in multiple respects. First, the TOS clearly and unmistakably delegate to the arbitrator threshold questions regarding nonsignatory enforcement through a broad delegation clause giving the arbitrator exclusive authority to determine "any claim or controversy as to arbitrability." A154 (§ 18). Questions of "'arbitrability'" include questions of nonsignatory enforcement such as "whether [an] arbitration contract b[inds] parties who did not sign the agreement." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (citation omitted). And the TOS reinforce that delegation by incorporating the *Arbitration Rules of the Singapore International Arbitration Centre* ("SIAC Rules"), which expressly authorize the arbitrator to resolve disputes over its "jurisdiction," as well as the TOS's

"scope" and "applicability." SIAC Rules, Rule 31.1 (7th ed. 2025), https://siac.org.sg/siac-rules-2025. Once again, each of those terms encompasses nonsignatory enforcement. The TOS's delegation clause and the SIAC Rules are each independently sufficient to take the ultimate decision regarding nonsignatory enforcement out of a court's hands—and the two provisions together remove all doubt.

The district court nonetheless refused to send the nonsignatory-enforcement dispute to the arbitrator because it believed that dispute concerned contract formation, which courts must decide before compelling arbitration. That was error. There was no dispute that an arbitration agreement was formed and *existed*. Rather, the only question was whether Defendants as nonsignatories could *enforce* the agreement. That is not a question of contract formation. In addition, the district court incorrectly believed this Court "implicit[ly]" determined that courts must decide questions of nonsignatory enforcement in *CCC Intelligent Solutions Inc. v. Tractable Inc.*, 36 F.4th 721 (7th Cir. 2022). A10. But *CCC* did not address—much less resolve—whether an arbitrator or court must decide nonsignatory enforcement questions when an agreement contains a valid delegation clause. The district court's delegation ruling should be reversed.

Second, the district court compounded its erroneous refusal to delegate the question of nonsignatory enforcement to the arbitrator by misapplying the law governing equitable estoppel. Because the arbitration agreement here (*i.e.*, the TOS) is a commercial contract with a Singaporean citizen, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards—also known as the New

York Convention—governs that arbitration agreement. To advance the New York Convention's primary aim of ensuring the uniform interpretation and enforcement of international arbitration agreements, courts have recognized that federal common law—not state law—controls threshold questions of arbitrability for agreements governed by the New York Convention. And here, a straightforward application of the federal common law of equitable estoppel makes clear that Plaintiffs cannot avoid arbitration of their claims, which are premised on allegations of "substantially interdependent and concerted misconduct" among signatory TFL and nonsignatory defendants. *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (citation omitted), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009).

The district court erred at each step of this analysis. Applying Illinois law governing equitable estoppel, the district court rejected Defendants' motion to compel arbitration. But the decision to apply state law, rather than federal, rested on inapposite cases that were not governed by the New York Convention and did not involve non-United States citizen signatories. And because the district court did not apply federal law, it did not recognize that Plaintiffs' claims in this case are a prototypical example of when equitable estoppel properly applies. Had the district court properly applied the federal common law of equitable estoppel, it would not have permitted Plaintiffs to circumvent their agreement to arbitrate claims against TFL by suing only nonsignatories for allegedly scheming with TFL. If this Court reaches the merits of equitable estoppel, the district court's decision cannot stand.

The decision below should be reversed.

## STATEMENT OF THE CASE

Defendants-Appellants in this case are: Jump Trading, LLC ("Jump Trading"), Jump Crypto Holdings LLC ("Jump Crypto"), William DiSomma, and Kanav Kariya. A89-90 (¶¶ 16-19). Jump Trading is a proprietary trading entity—that is, a trading entity that earns profits by investing its own funds—that is part of the Jump Trading Group and trades in traditional financial instruments. A89-90 (¶¶ 16-17). Jump Crypto is the holding company of the Jump Trading Group's digital asset division and focuses on investments related to and companies involved with cryptocurrency and blockchain technology. A90 (¶ 17); *see* A91 (¶ 26). William DiSomma is a co-founder of the Jump Trading Group. A90 (¶ 19). Kanav Kariya served as Jump Crypto's director of strategic initiatives from September 2020 until September 2021 and as its president from September 2021 until June 2024. A90 (¶ 18).

Plaintiffs-Appellees in this case are Taewoo Kim, Kashyap Patel, Kerry Woolley, and Ken Worsham, each of whom purchased the digital asset UST and together brought a putative class action alleging that Defendants "schemed with" a Singaporean company—TFL—and its founder Do Kwon to secretly manipulate the market price for UST. A85, 89 (¶¶ 1, 12-15).[2]

The instant appeal arises from the district court's order denying Defendants' motion to compel arbitration of Plaintiffs' claims.

[2] Many of Plaintiffs' allegations are demonstrably false. Defendants accept Plaintiffs' allegations as true only for the purposes of the motion to compel arbitration and this appeal.

### A. The Rise And Fall Of The Terra Blockchain And The Anchor Protocol

At the center of this case are the Terra blockchain; two digital assets associated with the Terra blockchain (UST and LUNA); and the Anchor Protocol. A126 (¶ 130); A50-51 (¶ 45).

1. From 2018 to 2019, TFL developed the Terra blockchain. A blockchain is a "sequence of digital records linked using encryption and distributed and managed typically in a peer-to-peer network." *Blockchain*, *Oxford English Dictionary*, https://doi.org/10.1093/OED/1087911741 (updated Mar. 2024). A blockchain provides "a secure and verifiable ledger of transactions" in digital assets. *Id.*

In 2019, as relevant here, TFL began selling two digital assets on the Terra blockchain: UST and LUNA. A85-86 (¶ 2). UST was created to be a "stablecoin"—a type of cryptocurrency that is designed so that its price tracks a specified asset, or, in cryptocurrency parlance, is "pegged" to that asset. A94-95 (¶ 38). UST was designed to be pegged to the price of the U.S. dollar. A96 (¶ 44). LUNA, by contrast, was a "native" token that could be used to vote on changes to the Terra blockchain or could be "lock[ed] up" (or "'stake[d]'") in exchange for rewards. A95-96 (¶ 43). LUNA's value "fluctuated … based on market conditions." A85-86 (¶ 2).

UST was designed to be a kind of stablecoin that was not backed by assets, such as fiat currency or bonds. *See* A94-95 (¶ 38). Rather, UST was an algorithmic stablecoin, meaning that its price would be maintained by an algorithm controlling the supply of the token, which, in turn, affects the value for which market participants are willing to exchange the token. *Id.* The algorithm through which

UST was supposed to remain pegged to the U.S. dollar depended on LUNA absorbing changes in UST's price. *See* A96-97 (¶¶ 45-46). This worked as follows: Under the protocol, no matter what UST's market price was, one UST could always be exchanged for $1 worth of LUNA (or vice versa). *Id.* This created arbitrage opportunities whenever UST deviated from its peg. For example, if UST's price dipped to $0.95, a trader could buy UST on the market for $0.95, burn it to mint $1 worth of LUNA, and sell that LUNA for $1, earning a profit of $0.05. *Id.* Conversely, if UST's price rose to $1.05, then a trader could burn a dollar's worth of LUNA to mint one UST and sell it for $1.05, again earning a profit of $0.05. *Id.* These arbitrage incentives were designed to adjust UST's supply and push its price toward the $1 peg. *Id.*

2. In March 2021, TFL launched a function on the Terra blockchain called the Anchor Protocol. A150-51 (¶ 45). According to Plaintiff Kim, TFL touted the Anchor Protocol as offering "the possibility of earning stable returns by depositing UST … in exchange for a deposit receipt in the form of aUST, which could later be swapped for the original amount of UST, plus interest." A40 (¶ 2). The Anchor Protocol offered a high yield (approximately 20% per year), which made UST very attractive. A61-62 (¶ 73). After the Anchor Protocol was introduced, the number of UST tokens in circulation exploded from 2.1 billion to 19 billion. A102 (¶ 64); A61 (¶ 72). As of May 2022, nearly three quarters of all the UST tokens in circulation were deposited in the Anchor Protocol. A61 (¶ 72).

Users connected to the Anchor Protocol through a web application called the "Anchor Protocol Interface" ("Interface"). A145 (¶ 2).[3] In order to use the Interface, a user had to connect a digital wallet to the Interface and agree to the TOS. A145 (¶¶ 2-3). At all relevant times, the TOS contained a clause requiring arbitration of "[a]ny claim or controversy arising out of or relating to the Interface, this Agreement, … or any other acts or omissions for which you may contend that [TFL is] liable." A154 (§ 18); *see* A146 (¶ 4). The arbitration agreement also included a broad delegation clause, delegating "any claim or controversy as to arbitrability" to an arbitrator. A154 (§ 18). And the arbitration agreement provided that covered disputes "shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre." *Id.*

3. As alleged, "the ability of the TFL algorithm to maintain UST's $1 peg was key to the value of UST and aUST." A73 (¶ 115). In May 2021, when UST's price deviated from its $1 peg, UST's and aUST's market prices temporarily fell. A103, 107 (¶¶ 73, 82). But UST's peg was ultimately restored, and UST's and aUST's prices stabilized. A103, 106-07 (¶¶ 73, 81-82). In May 2022, however, the prices of UST and aUST permanently collapsed, leading to a chain of events that "took" down "LUNA,

[3] All information about the Anchor Protocol Interface and the Anchor Terms of Service comes from the Declaration of Arrash Chris Amani (formerly Chief Operating Officer and Chief Financial Officer of TFL), filed in this case on September 26, 2024. A144-56. It is appropriate to rely on declarations in considering a motion to compel arbitration because the evidentiary standard for a motion to compel arbitration is the same as that for summary judgment. *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 618 (7th Cir. 2024); *see* Fed. R. Civ. P. 56(c)(1)(A).

the Anchor Protocol, and the entire Terra blockchain." A62 (¶ 75); A119-20 (¶¶ 107-09). According to Plaintiffs, this collapse "destroy[ed] … over $18 billion of value in UST and aUST." A62 (¶ 75); A120 (¶ 109).

### B. Plaintiffs' Lawsuit And Defendants' Motion To Compel Arbitration

1. The four Plaintiffs—Taewoo Kim, Kashyap Patel, Kerry Woolley, and Ken Worsham—purchased UST between November 2021 and May 2022 and deposited around 95% of their UST tokens on the Anchor Protocol. A123-26 (¶¶ 120-26, 129-30). Like all other users, before depositing their UST on the Anchor Protocol, Plaintiffs first accepted the TOS and the arbitration agreement therein. A145-56 (¶¶ 2-4).

2. In May 2023, Plaintiff Kim filed a putative class action against Jump Trading and Kariya, then president of Jump Crypto, alleging violations of the Commodity Exchange Act, 7 U.S.C. § 2 et seq., Commodity Futures Trading Commission ("CFTC") regulations, 17 C.F.R. §§ 180.1, 180.2, and common law unjust enrichment. A67-68 (¶¶ 94-138). The Complaint alleged that Jump Trading was "an early partner and primary financial backer of TFL" and that Jump Trading and Kariya "schemed with Do Kwon … and his company [TFL] to manipulate the market price for UST and aUST and to conceal their manipulation, for their own benefit," resulting in the devaluation of assets held by Plaintiff and the putative class. A39-40 (¶¶ 1, 3). Despite the centrality of TFL and Do Kwon (the mastermind) to the alleged scheme, Kim's lawsuit did not name TFL or Do Kwon as defendants.

The allegations centered around the May 2021 drop in UST's price. According to the Complaint, UST's peg was restored artificially through concerted actions by TFL and Jump Trading, including "secret, coordinated" trades of "more than 62 million UST tokens," and not organically by the algorithm. A40 (¶ 4). The Complaint also alleged that Jump Trading "actively concealed and aided and abetted TFL's and Kwon's concealment" of the alleged interventions to artificially maintain the peg. A41 (¶ 7). The Complaint highlighted the centrality of the Anchor Protocol to the alleged scheme by mentioning aUST and the Anchor Protocol well over 100 times. *See, e.g.*, A39-40, 50-51, 55 (¶¶ 2, 45, 57). The Complaint also detailed Plaintiff Kim's use of the Anchor Protocol to swap the vast majority of his UST tokens for aUST. A64-65 (¶¶ 82-85).

3. In July 2024, Jump Trading and Kariya moved (1) to compel arbitration under the arbitration agreement that Kim consented to when using the Anchor Protocol, A31 (Dkt. No. 55); and, in the alternative, (2) to dismiss the Complaint for failure to state a claim, A32 (Dkt. No. 56).

Although Jump Trading and Kariya are not signatories to the arbitration agreement that Kim entered into with TFL, nonsignatories may compel arbitration based on well-established contract-law principles, including equitable estoppel. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009). Under federal common law, the doctrine of equitable estoppel permits a nonsignatory to enforce an arbitration agreement against a signatory where "(1) the 'signatory references to or presumes the existence of a written agreement in asserting its claims against a non-

signatory', or (2) the signatory 'raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract.'" *Sosa v. Onfido, Inc.*, 8 F.4th 631, 641-42 (7th Cir. 2021) (citation omitted). These rules prevent a signatory plaintiff from avoiding a contractual commitment to arbitrate simply by suing nonsignatory defendants for claims that are "based on the same facts and inherently inseparable" from claims the plaintiff could have brought against a signatory. *MS Dealer*, 177 F.3d at 948 (citation omitted).

Jump Trading and Kariya argued that because the arbitration agreement broadly delegates all questions of arbitrability to an arbitrator, the question of whether they could compel arbitration under equitable-estoppel principles was for an arbitrator, not the court, to decide. Dkt. No. 55 at 8-18. Jump Trading and Kariya further argued that if the district court concluded otherwise, it should compel arbitration under the federal common law of equitable estoppel, which permits nonsignatories to compel arbitration of claims, like those at issue here, involving alleged interdependent and concerted misconduct with a signatory. *Id.* at 18-25.

4. Instead of opposing Jump Trading and Kariya's motions, Kim amended his complaint. The Amended Complaint added three new plaintiffs (Patel, Woolley, and Worsham) and two new defendants (Jump Crypto and William DiSomma). In general, the allegations in the Amended Complaint mirrored those in the Original Complaint. But there was one glaring difference between the pleadings: The Amended Complaint scrubbed most mentions of aUST and the Anchor Protocol, cutting the Original Complaint's 100-plus mentions down to 6. However, the

Amended Complaint still made clear that each Plaintiff used the Anchor Protocol and that virtually all of Plaintiffs' alleged losses were from UST that they had deposited on the Anchor Protocol. A126 (¶¶ 128-30).[4]

5. On September 26, 2024, Defendants again moved to compel arbitration of all of Plaintiffs' claims, echoing the arguments Jump Trading and Kariya made in the motion they filed in response to the Original Complaint. A34 (Dkt. No. 82).

### C. The District Court's Order

On May 9, 2025, the district court denied Defendants' motion to compel arbitration. A1-19. The district court first concluded that despite the arbitration agreement's delegation of "any claim or controversy as to arbitrability" to the arbitrator, the question of nonsignatory enforcement was for the court, not an arbitrator, to decide. A6-7 (quoting A154 (§ 18)). The court acknowledged that "[s]ome circuits" have held that this "is a question of enforceability for the arbitrator." A8-9. But the court concluded that nonsignatory enforcement is a question of contract formation for the court to decide. A12. In doing so, the court relied on this Court's decision in *CCC*. A9-12. Although the court acknowledged that *CCC* "focus[ed] its analysis" on a different question and "never explicitly addressed" whether the court or arbitrator should decide questions of nonsignatory enforcement, it viewed *CCC* as

[4] Despite Plaintiffs' filing of an Amended Complaint, it is still appropriate to cite the Original Complaint for relevant facts. As this Court has explained, "[a]n amended pleading does not operate as a judicial *tabula rasa*" so "'a party may offer earlier versions of its opponent's pleadings as evidence of the facts therein.'" *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1048 (7th Cir. 2019) (citation omitted).

"implicit[ly]" concluding that courts should decide nonsignatory-enforcement questions. A10-11.

Next, the district court addressed Defendants' argument that Plaintiffs were equitably estopped from avoiding arbitration. As a threshold matter, the court held that Illinois law, not federal common law, should govern whether Defendants could compel Plaintiffs to arbitrate their claims based on equitable estoppel. A16-17. The court explained that absent "clearer instruction from the Seventh Circuit," it was reluctant to "depart from the 'fundamental principle' that a 'nonparty's right to enforce an arbitration agreement is governed by state law.'" A16 (quoting *Sosa*, 8 F.4th at 637). In doing so, the court rejected Defendants' argument that the New York Convention requires the application of federal common law to their equitable-estoppel argument. A14-16.

On the merits of equitable estoppel, the district court concluded that Illinois law did not permit Defendants to compel arbitration of Plaintiffs' claims. The court first explained that for a nonsignatory to an arbitration agreement to assert equitable estoppel under Illinois's equitable-estoppel test, "[the nonsignatory] 'must have relied upon the acts or representations of the [signatory] and have had no knowledge or convenient means of knowing the facts, and such reliance must have been reasonable.'" A18 (quoting *Sosa*, 8 F.4th at 641). The court then explained that Defendants could not satisfy that test because they "have not identified any representation that plaintiffs made to defendants to induce them to rely on the

agreement's arbitration provision." *Id.* The district court did not analyze Defendants' arguments under "federal common law principles" of equitable estoppel. *Id.*

## STANDARD OF REVIEW

A district court's denial of a motion to compel arbitration is reviewed by this Court de novo. *Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014, 1019 (7th Cir. 2024). Any underlying findings of fact are reviewed for clear error. *Id.* A district court's decision regarding equitable estoppel is reviewed "for an abuse of discretion." *Sosa*, 8 F.4th at 638-39 (citation omitted). "[A]n error of law is necessarily an abuse of discretion." *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 848 (7th Cir. 2015).

## SUMMARY OF ARGUMENT

Plaintiffs are parties to the TOS, which indisputably require them to arbitrate any disputes over arbitrability. None of the reasons the district court gave for denying Defendants' motion to compel arbitration withstands scrutiny.

**I.** The district court held that it—and not the arbitrator—was required to decide whether nonsignatories such as Defendants can enforce the TOS against users such as Plaintiffs. That holding rests on a misreading of inapposite precedent.

**A.** When parties agree that an arbitrator should resolve threshold questions of arbitrability, that choice must be given effect. Here, the TOS clearly and unmistakably delegate gateway questions of nonsignatory enforcement to the arbitrator in at least two ways. First, the TOS contain a delegation clause that gives the arbitrator exclusive authority to resolve "any claim or controversy as to arbitrability." A154 (§ 18). And second, the TOS incorporate the SIAC Rules, which constitute clear and unmistakable evidence that the parties agreed to arbitrate

disputes over the arbitrator's "jurisdiction," as well as the TOS's "scope" and "applicability." SIAC Rule 31.1. As a matter of text, precedent, and common sense, each of these terms encompasses questions of whether a nonsignatory may enforce the arbitration agreement against a signatory. An arbitrator, not a court, must resolve whether Defendants can enforce the TOS against Plaintiffs.

**B.** The district court nonetheless refused to enforce the TOS's unequivocal delegation for two reasons. First, the court believed that nonsignatory enforcement is a question of contract formation, which courts must decide before compelling arbitration. But nonsignatory-enforcement disputes ask whether a signatory who *accepted* an arbitration agreement may have that agreement *enforced* against him by a nonsignatory. There is no question that an agreement exists. And whether that existing agreement can be enforced by a nonsignatory under background contract-law principles has nothing to do with the agreement's formation—as numerous other courts of appeals have held in enforcing delegation clauses in materially identical circumstances.

Second, the district court believed this Court "implicit[ly]" answered the "who decides" question in *CCC Intelligent Solutions*. A10, 12 n.7. But *CCC* did not involve a nonsignatory-enforcement issue—much less an argument that nonsignatory enforcement was an issue for the arbitrator. And the Court said nothing about whether nonsignatory enforcement can (or cannot) be delegated to the arbitrator. The district court took a "cue" from a decision that has no bearing on the question at issue here. A12.

**II.** The district court's equitable-estoppel ruling is equally flawed.

**A.** The arbitration agreement in this case is governed by the New York Convention, which governs commercial arbitration agreements unless the agreements are "entirely between citizens of the United States." 9 U.S.C. § 202. Because the TOS's arbitration provision is a commercial contract between TFL (a Singaporean company) and Plaintiffs (who are United States citizens), the New York Convention applies. In holding otherwise, the district court incorrectly focused on the citizenship of the parties to "*this* dispute"—rather than the parties to the arbitration agreement, as the plain text of the New York Convention requires. A14.

**B.** To advance the New York Convention's primary objective of promoting uniform enforcement of international arbitration agreements, *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 579 (7th Cir. 2007), the equitable-estoppel inquiry in this case must be resolved in accordance with federal common law, not Illinois law. The district court's contrary conclusion rested on a misreading of this Court's precedent. Instead of following this Court's clear guidance about the importance of uniform enforcement of international arbitration agreements in *Certain Underwriters*, the district court invoked cases resolving equitable-estoppel arguments under state law that involved agreements between United States citizens.

**C.** Federal common law requires arbitration of Plaintiffs' claims. It is well-settled that under the federal common law of equitable estoppel, a plaintiff who has signed an arbitration agreement and alleges interdependent and concerted misconduct involving a signatory and a nonsignatory cannot avoid arbitration of

claims covered by that agreement. *MS Dealer*, 177 F.3d at 948. Without this rule, a plaintiff could easily evade an agreement to arbitrate simply by alleging that nonsignatories aided and abetted a signatory's misconduct but not naming the signatory as a defendant. Because that is precisely the type of suit that Plaintiffs have filed here, their claims belong in arbitration.

## ARGUMENT

### I. THE ARBITRATOR MUST DECIDE WHETHER A NONSIGNATORY MAY ENFORCE THE ARBITRATION AGREEMENT AGAINST PLAINTIFFS

Under the FAA, an arbitration agreement may let "an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability," such as whether that agreement "covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67-68 (2019) (citation and quotation marks omitted). When an agreement "delegates the arbitrability question to an arbitrator, a court may not override the contract" and "possesses no power to decide the arbitrability issue." *Id.* at 68. Here, the TOS unequivocally delegate to the arbitrator threshold questions of nonsignatory enforcement in multiple ways. This Court must enforce the TOS as written and send the parties' dispute over whether Defendants may enforce the agreement to the arbitrator to resolve.

#### A. The Anchor TOS Clearly And Unmistakably Delegate To The Arbitrator Whether Defendants Can Enforce The Arbitration Agreement

The FAA generally limits federal-court review of arbitration agreements to two categories of issues. The first is whether an agreement to arbitrate "exists." *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022). That "contract-*formation* issue" is

always a matter for "the court" to decide. *Id.* (emphasis added); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-300 (2010). If a court determines that a contract has been formed, the second issue is how far that agreement extends or whether—and by whom—it can be enforced. In contrast to a court's purview over contract-formation questions, parties can "agree by contract that an arbitrator, rather than a court, will resolve" these "threshold arbitrability questions." *Henry Schein*, 586 U.S. at 65.

Parties often do exactly that through a "delegation provision," in which they agree to arbitrate "whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). It is well-settled that "if there is a contract, then an arbitration clause may delegate *all other issues* … to the arbitrator." *K.F.C.*, 29 F.4th at 837 (emphasis added). That includes questions of "arbitrability," such as "whether the arbitration contract b[inds] parties who did not sign the agreement." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (citation omitted). If the agreement "clear[ly] and unmistakabl[y]" delegates such arbitrability questions to the arbitrator, a court must honor the parties' agreement and enforce the delegation provision as written. *Henry Schein*, 586 U.S. at 68-69 (citation omitted).

The TOS here clearly and unmistakably delegate the gateway question of nonsignatory enforcement in two independently sufficient ways: (1) through an express provision delegating questions of arbitrability to the arbitrator; and (2) by

incorporating the SIAC Rules delegating questions of the arbitrator's jurisdiction and the agreement's scope and applicability to the arbitrator.

### 1. The TOS's Delegation Clause Clearly And Unmistakably Delegates The Arbitrability Question Of Nonsignatory Enforcement To The Arbitrator

The TOS's delegation clause clearly and unmistakably delegates the issue of nonsignatory enforcement to the arbitrator. Under the TOS, "any claim or controversy as to arbitrability … shall be referred to and finally resolved by arbitration." A154 (§ 18). As the district court correctly recognized, that is the kind of language "ordinarily required to delegate questions of arbitrability to an arbitrator." A7.

And the issue of nonsignatory enforcement is one of "arbitrability." A154 (§ 18). The term "arbitrability" encompasses all gateway matters relating to whether a particular dispute can be arbitrated, including whether an arbitration agreement is "enforceable." *Arbitrability*, *Black's Law Dictionary* (12th ed. 2024). To that end, the Supreme Court has expressly characterized "whether [an] arbitration contract b[inds] parties who did not sign the agreement" as a question of "'arbitrability.'" *Howsam*, 537 U.S. at 84 (citation omitted); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 n.5 (2009). This Court has likewise explained that whether nonsignatory defendants can enforce an arbitration agreement is an issue of "arbitrability." *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 743-44 (7th Cir. 2010); *see also, e.g.*, *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 355 (6th Cir. 2022) ("enforceability challenge[s]" are questions of "arbitrability"); *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1299, 1302 (11th Cir. 2022) (similar).

Accordingly, when (as here) a delegation clause commits threshold "arbitrability" questions to the arbitrator, any dispute over whether a nonsignatory may enforce the agreement is for the arbitrator to resolve.

### 2. The TOS's Incorporation Of The SIAC Rules Reinforces That Whether A Nonsignatory Can Enforce The Agreement Is For The Arbitrator To Decide

The TOS's express incorporation of the SIAC Rules independently constitutes clear and unmistakable evidence that disputes over nonsignatory enforcement must be resolved by an arbitrator. The TOS state that any claim covered by the arbitration provision, including "any claim or controversy as to arbitrability," shall be "finally resolved by arbitration … in accordance with the Arbitration Rules of the Singapore International Arbitration Centre." A154 (§ 18). Under SIAC Rule 31.1, "[t]he Tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, validity, applicability, or scope of the arbitration agreement." SIAC Rule 31.1.

Incorporation of the SIAC Rules "constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (incorporation of AAA rules). This Court has held that when a contract states that arbitration shall be conducted "according to" a set of arbitral rules, the agreement "incorporate[s]" those "rules and procedures." *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 613, 622 (7th Cir. 2024); *see also Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1272-73 (7th Cir. 1976). And an agreement's incorporation of arbitral rules delegating arbitrability to the arbitrator clearly shows that the parties agreed to arbitrate arbitrability. Although

this Court has never directly held as much, *every other circuit* has done so. *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 846 (6th Cir. 2020) (collecting cases from eleven other circuits and noting that Seventh Circuit precedent "suggest[s] that it would join this consensus"). This Court should now adopt the inter-circuit consensus on this "straightforward" issue. *Id.*[5]

The SIAC Rules clearly and unmistakably delegate questions of nonsignatory enforcement in three ways.

First, the SIAC Rules broadly delegate "jurisdiction[al]" issues to the arbitrator. SIAC Rule 31.1. Rules that "giv[e] the arbitral tribunal the authority to decide its own jurisdiction … vest the arbitrator with the apparent authority to decide questions of arbitrability." *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1073 (9th Cir. 2013). Such questions include whether a nonsignatory can enforce an arbitration agreement. In *Blanton*, the Sixth Circuit considered language in the American Arbitration Association Rules giving the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement"—language nearly identical to SIAC

[5] District courts in this Circuit have "repeatedly h[e]ld" that incorporation of arbitral rules delegating gateway questions to the arbitrator confirms that the parties agreed to arbitrate arbitrability. *Dirth v. Oak St. Health, Inc.*, No. 24 C 5290, 2025 WL 524142, at *5 (N.D. Ill. Feb. 18, 2025) (citation omitted); *see also, e.g.*, *Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*, 51 F.Supp.3d 713, 719-20 (N.D. Ill. 2014) (collecting cases). And courts across the country have concluded that an arbitration agreement's "incorporation of the SIAC Rules … clearly and unmistakably delegates arbitrability to the arbitrator." *Pilot Inc. v. Tyc Brother Indus. Co.*, No. 2:20-cv-02978, 2020 WL 3833597, at *4 (C.D. Cal. July 8, 2020); *see also, e.g.*, *Gannon Int'l, Ltd. v. Blocker*, No. 4:10CV0835, 2011 WL 111885, at *18-19 (E.D. Mo. Jan. 13, 2011).

Rule 31.1. 962 F.3d at 848 (emphasis and citation omitted). The court held that this reference to "jurisdiction" delegated to the arbitrator "whether a non-signatory may enforce the agreement under state contract law," thus precluding a court from resolving the question. *Id.*; *see also Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) (same); *Anderton v. Practice-Monroeville, P.C.*, 164 So. 3d 1094, 1101-02 (Ala. 2014) (same). So too here.

Second, the SIAC Rules also delegate disputes regarding the "scope of the arbitration agreement" to the arbitrator. SIAC Rule 31.1. The plain meaning of the word "scope" is the "range of matters considered or dealt with." *Scope*, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/scope (last visited Aug. 6, 2025). "Scope" thus connotes how far an arbitration agreement extends—that is, the circumstances in which it does or does not apply, and whether the agreement covers a particular controversy. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) (scope concerns "*whether* a particular merits-related dispute is arbitrable" (citation omitted)).

Questions of nonsignatory enforcement fit comfortably within the plain meaning of "scope." The parties dispute the "range of matters" that the arbitration provision "deal[s] with," *Scope, Cambridge Dictionary*, *supra*—Defendants contend the provision extends to certain disputes with nonsignatories, while Plaintiffs argue the provision governs only disputes between signatories. And the Supreme Court has confirmed that questions regarding the "scope" of an agreement "includ[e] the question of *who is bound*" by the agreement pursuant to "'traditional principles'" such

as "'estoppel.'" *Arthur Andersen*, 556 U.S. at 630-31 (emphasis added) (citation omitted). The SIAC Rules squarely delegate to the arbitrator the question of whether equitable estoppel applies to Plaintiffs' claims.

Third, the SIAC Rules delegate disputes regarding the agreement's "applicability" to the arbitrator. SIAC Rule 31.1.[6] An arbitration agreement is "applicable" if it is legally "[c]apable of being applied" in a given case. *Applicable, Black's Law Dictionary*, *supra*. And questions of nonsignatory enforcement are all about whether an agreement is "[c]apable of being applied" by a given defendant under governing law.

In short, by incorporating the SIAC Rules, the TOS delegate the issue of nonsignatory enforcement *three times over* by giving the arbitrator the power to decide questions of "jurisdiction," "scope," and "applicability." Each of these terms clearly and unmistakably delegates the nonsignatory-enforcement issue here to the arbitrator. Combining all three, there can be no question: Plaintiffs agreed to delegate whether Defendants can enforce the TOS.

---

[6] Although the version of the SIAC Rules in effect at the time Plaintiffs filed this lawsuit did not expressly delegate disputes regarding the agreement's "applicability" to the arbitrator, the relevant SIAC rule was otherwise identical to the present-day rule. *See* SIAC Rules, Rule 28.2 (6th ed. 2016), https://siac.org.sg/siac-rules-2016 ("The Tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, validity or scope of the arbitration agreement."). Both the 2016 and present-day SIAC Rules unequivocally delegate questions of nonsignatory enforcement to the arbitrator.

### B. The District Court Erred By Deciding The Question Of Nonsignatory Enforcement

The district court did not deny that the TOS "contain[] the sort of clear and unmistakable intent ordinarily required to delegate questions of arbitrability to an arbitrator." A7. And the court correctly recognized that "whether an arbitration agreement can be used to compel arbitration by a non-signatory defendant 'is a question of the enforceability of the arbitration clause.'" A8 (citation omitted). Accordingly, the court acknowledged, nonsignatory enforcement "seems at first glance like a question for the arbitrator." *Id.*

Nonetheless, the district court concluded that "ordinar[y]" rules of delegation do not apply here for a single reason: Defendants were "not parties to the contract between [P]laintiffs and TFL." A7. And the district court held that whether "[D]efendants as non-signatories to the [TOS] can compel arbitration with [P]laintiffs is a question for [the court] to decide," not the arbitrator. A12. The district court offered two reasons for that conclusion: (1) It believed nonsignatory enforcement is a question of contract formation that courts must decide; and (2) it believed this Court had "implicit[ly]" determined that courts must decide questions of nonsignatory enforcement in *CCC Intelligent Solutions Inc. v. Tractable Inc.*, 36 F.4th 721 (7th Cir. 2022). A9-13. Neither justification withstands scrutiny.

1. The district court concluded that disputes over nonsignatory enforcement cannot be delegated to the arbitrator because they concern contract formation, an issue for the court. A8-9, 11-13. That determination is squarely at odds with Supreme Court precedent. And it flatly contravenes decisions from six

courts of appeals holding that nonsignatory enforcement is *not* a question of contract formation, but rather a question of whether an existing contract may be enforced under background contract-law doctrines such as equitable estoppel.

When a party contests whether an arbitration agreement exists at all, that is a contract-formation issue the court must resolve before ordering arbitration. *Granite Rock*, 561 U.S. at 299-300. But nonsignatory-enforcement disputes ask whether a signatory who *accepted* an arbitration agreement may have that agreement "*enforced*" against him by someone who is not a party to that contract. *Arthur Andersen*, 556 U.S. at 631 (emphasis added); *see also GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 438 (2020). Nonsignatories regularly assert such rights under "traditional principles" of contract law such as equitable estoppel, assumption, alter ego, third-party beneficiary, and other theories. *Arthur Andersen*, 556 U.S. at 631-32 (quoting 21 Williston on Contracts § 57:19 (4th ed. 2001)).

In such cases, formation of the underlying contract is not at issue: Because the signatory has agreed to be bound by the relevant contract, there is no question "whether [an] agreement *exists*." *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 144 (3d Cir. 2022); *see also Becker*, 39 F.4th at 356. The nonsignatory-enforcement doctrines implicate "the scope of [an] agreement[]" and the rights it bestows, not its formation or existence. *See Arthur Andersen*, 556 U.S. at 631-32. Indeed, the ultimate success (or failure) of a nonsignatory's equitable-estoppel argument would not show that a contract does (or does not) exist between the nonsignatory and the

signatory. *See Zirpoli*, 48 F.4th at 143-44. Rather, it would simply show that the nonsignatory can (or cannot) enforce the contract the signatory indisputably accepted. That the contract will continue to exist in either scenario confirms that nonsignatory-enforcement disputes have nothing to do with contract formation.

The district court did not consider these realities. Nor did it acknowledge the Supreme Court's instruction that "whether the arbitration contract b[inds] parties who did not sign the agreement" is an arbitrability question that can be delegated. *Howsam*, 537 U.S. at 84. If the district court were correct that nonsignatory enforcement were a contract-formation question, then nonsignatory enforcement could *never* be delegated—and that would conflict with *Howsam*.

Adopting the district court's view that nonsignatory enforcement goes to contract formation would also put this Court in direct conflict with decisions from the First, Second, Third, Sixth, Eighth, and Tenth Circuits. Those circuits have held that when an arbitration agreement contains a valid delegation clause, the arbitrator must typically decide questions of nonsignatory enforcement. *See Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 473-74 (1st Cir. 1989); *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 210-11 (2d Cir. 2005); *Zirpoli*, 48 F.4th at 141-45; *Blanton*, 962 F.3d at 848-52; *Eckert/Wordell Architects*, 756 F.3d at 1100; *Casa Arena Blanca LLC v. Rainwater*, No. 21-2037, 2022 WL 839800, at *5 (10th Cir. Mar. 22, 2022). These courts correctly recognize that nonsignatory enforcement is "a question of enforceability, not existence," that can be delegated to the arbitrator. *Becker*, 39 F.4th at 356; *see also Zirpoli*, 48 F.4th at 144 (nonsignatory-enforcement dispute "goes

directly to whether [the nonsignatory] can *enforce* arbitration as the agreement provides, not whether the agreement *exists*; it clearly does exist"). The district court's conclusion that nonsignatory enforcement concerns contract formation—and thus can *never* be delegated to the arbitrator—contravenes each of these decisions.

The district court relied on the Fifth Circuit's decision in *Newman v. Plains All American Pipeline, L.P.*, for the proposition that nonsignatory enforcement is a question of contract formation for courts to decide. A12 (citing 23 F.4th 393, 398 (5th Cir. 2022)).[7] But as three Fifth Circuit judges subsequently observed, *Newman* is "out of step with at least five (if not more)" other circuits' precedent holding that nonsignatory enforcement is *not* a question of contract formation. *Newman v. Plains All Am. Pipeline, L.P.*, 44 F.4th 251, 254-55 (5th Cir. 2022) (Jones, J., dissenting from denial of en banc rehearing). *Newman* did not "even acknowledg[e]" those "conflicting precedents." *Id.* at 255. In any event, *Newman*'s core error was the same as the district court's: conflating the question of who can enforce a contract with the question of whether a contract exists. The Fifth Circuit ignored that a contract plainly *exists* in nonsignatory-enforcement disputes, and that the only question is who can *enforce* that existing contract—which is a question of arbitrability, not contract formation.[8]

---

[7] The Fourth and Ninth Circuits have likewise held that courts must resolve nonsignatory-enforcement questions in certain circumstances. *See Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 287 (4th Cir. 2023); *Patterson v. Jump Trading, LLC*, Nos. 24-670, 24-2489, 2025 WL 215519, at *1 (9th Cir. Jan. 16, 2025). Jump Trading has sought Supreme Court review of the Ninth Circuit's decision in *Patterson*. *See Jump Trading, LLC v. Patterson* (U.S. No. 24-1266 docketed June 12, 2025). Jump Trading's petition for a writ of certiorari remains pending.

[8] The district court quoted *Newman* for the proposition that "enforceability" and "existence" are "two sides of the same coin" because "[w]hen a court decides whether

The district court also stated that "an 'arbitrator cannot resolve any issues until the court has ascertained that there is an actual agreement' *between the parties*." A12 (quoting *K.F.C.*, 29 F.4th at 837). But the district court's addition to the quote (italicized above) gives away the game. Although *K.F.C.* correctly instructs that a court first determine whether "there is an actual agreement" before compelling arbitration, 29 F.4th at 837, *K.F.C.* does not suggest that the agreement must be between the parties to the litigation. That makes sense, as *K.F.C.* involved an arbitration agreement between a signatory plaintiff and a signatory defendant, *id.* at 836-37; it had nothing to do with (and said nothing about) nonsignatory enforcement.

The district court wrongly modified the first-step formation requirement to address not whether an arbitration agreement exists, but rather whether an arbitration agreement exists *between the plaintiff and the defendant*. There is no basis for that additional requirement, which flouts the long-established principle that "whether the arbitration contract b[inds] parties who did not sign the agreement" is an arbitrability question that can be delegated. *Howsam*, 537 U.S. at 84. That is

---

an arbitration agreement exists, it necessarily decides its enforceability between parties." A12 (alteration in original) (quoting *Newman*, 23 F.4th at 398). That is incorrect. A court's determination that an arbitration agreement "exists" between two signatories does not "decide[]" whether a nonsignatory can enforce it. *Id.* (citation omitted). The enforceability question turns on whether the nonsignatory can leverage entirely separate "background principles of state contract law," including, for example, equitable estoppel, assumption, and third-party beneficiary theories. *Arthur Andersen*, 556 U.S. at 630-31. Indeed, whether an arbitration agreement "exists" does not even "decide[] its enforceability" between signatories. A12 (quoting *Newman*, 23 F.4th at 398). A signatory may have a valid defense to enforcement, such as an argument that the other signatory waived its right to enforce the agreement. *See, e.g.*, *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

true whether the party seeking to enforce the agreement is a signatory or a nonsignatory. *Becker*, 39 F.4th at 356. Nonsignatory enforcement is not a question of contract formation.

2. Apart from its erroneous conflation of contract formation and enforceability, the district court's conclusion that nonsignatory enforcement was a "question for it to decide" rested entirely on its interpretation of this Court's decision in *CCC Intelligent Solutions*. *See* A9-12 ("tak[ing] its cue from *CCC*," which "provides a way out of [the nonsignatory-enforcement] conundrum"). According to the district court, *CCC* "implicit[ly]" determined that courts must decide questions of nonsignatory enforcement. A10. That too is mistaken. This Court in *CCC* did not resolve (either explicitly or implicitly) whether the arbitrator or court must decide questions of nonsignatory enforcement when an arbitration agreement contains a valid delegation clause. That remains an open question in this circuit.

In *CCC*, the defendant (Tractable Inc.) argued that it could compel arbitration not as a nonsignatory, but as the real party to the contract. *See* 36 F.4th at 723 ("Tractable does not claim to be a third-party beneficiary of the contract between [the plaintiff] and JA Appraisal"; rather, "Tractable asserts that it *is* JA Appraisal").[9] Tractable expressly *asked* this Court to decide "whether a contract between [the

[9] According to the plaintiff, Tractable sent one of its employees to obtain a license to use the plaintiff's software. *CCC*, 36 F.4th at 722. Purporting to represent "JA Appraisal," the employee executed a contract with the plaintiff; the signatory to the contract was JA Appraisal. *Id.* In its motion to compel arbitration (and on appeal), Tractable contended that "JA Appraisal" is "just a name that Tractable uses for itself." *Id.* at 723.

plaintiff] and Tractable existed," arguing that "there is no genuine dispute that JA Appraisal *is* Tractable" and was "*a party to the arbitration agreement*." Appellant Br. 17, 24, *CCC Intelligent Sols. Inc. v. Tractable Inc.*, 36 F.4th 721 (7th Cir. 2022) (No. 19-1997), ECF No. 31 (second emphasis added). There was thus no question of nonsignatory enforcement before the Court. Indeed, Tractable maintained that "the circumstances in which a non-signatory third party may invoke an arbitration clause are beside the point" because "Tractable is not some third party trying to invoke a contract negotiated and signed by a distinct entity." *Id.* at 22-23.

Because Tractable did not raise an issue of nonsignatory enforcement—much less argue that any such issue was delegated to the arbitrator—this Court did not consider whether nonsignatory enforcement was for the arbitrator or the court to resolve. The Court's decision to deny arbitration because "Tractable is not a party to this contract," 36 F.4th at 724, simply answered the distinct question Tractable asked the Court to decide: Is Tractable the same entity as JA Appraisal?

The district court acknowledged that "the Seventh Circuit [in *CCC*] never explicitly addressed who should decide whether [the nonsignatory] could enforce the contract." A10. But it nonetheless believed that this Court's answer was "implicit in its approving description of the district court's approach" in that case. *Id.* As an initial matter, all this Court in *CCC* said about the underlying district court decision was that the district court determined "that a judge must decide whether the parties have agreed to arbitrate" and "concluded" that Tractable had no "rights" under the contract because "Tractable is not a party to an agreement with [the plaintiff]." *CCC*,

36 F.4th at 723. This Court never "approv[ed]" of the *CCC* district court's approach, A10; it simply summarized the district court's decision for purposes of background.

In any event, the district court's own observation that *CCC* never actually "addressed" whether questions of nonsignatory enforcement can be delegated to the arbitrator, A10, confirms *CCC*'s inapplicability here. This Court has long cautioned that issues "lurking in the record but not addressed" in a prior decision "do not bind th[is] [C]ourt in later cases." *R.R. Donnelley & Sons Co. v. FTC*, 931 F.2d 430, 433 (7th Cir. 1991); *see also, e.g.*, *Teledyne Techs. Inc. v. Shekar*, 831 F.3d 936, 940 n.3 (7th Cir. 2016) (earlier decision "not binding" when that decision "did not address" relevant issue before the Court in subsequent case); *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004). So too here: Because *CCC* did not address (much less issue a holding on) whether nonsignatory enforcement is a question for the arbitrator or the court when an agreement delegates arbitrability to the arbitrator, *CCC* does not bind, or even inform, this Court's resolution of that question in the present case.

The district court's decision to resolve the parties' nonsignatory-enforcement dispute itself is incompatible with Supreme Court precedent and the weight of out-of-circuit authority. And it was not compelled by—and indeed, should not have even been informed by—this Court's decision in *CCC*. This Court should enforce the TOS's broad delegations and send the parties' dispute over whether Defendants can enforce the TOS to the arbitrator.

## II. EQUITABLE ESTOPPEL ENTITLES DEFENDANTS TO COMPEL ARBITRATION OF PLAINTIFFS' CLAIMS

Even if this Court were to agree with the district court on the who-decides question, it should still reverse the district court's denial of Defendants' motion to compel arbitration. That is because Plaintiffs' substantive claims must be analyzed under the federal standard for equitable estoppel, which applies in this case. The federal common law standard applies because (A) the arbitration provision in the TOS is an international commercial arbitration agreement and, as such, is governed by the New York Convention; and (B) agreements subject to the New York Convention must be interpreted and enforced in accordance with federal common law under the Supreme Court's test for when federal common law supplants state law. The district court erred in rejecting both of these premises and thus erred in concluding that Illinois state law—instead of federal common law—supplies the applicable standard. And under the federal common law test for equitable estoppel, Plaintiffs' claims must be arbitrated because they are based on alleged interdependent and concerted misconduct between Defendants and a signatory (TFL).

### A. The New York Convention Governs The Arbitration Agreement

1. The New York Convention is a "multilateral treaty that addresses international arbitration." *GE Energy*, 590 U.S. at 438. The United States acceded to the New York Convention in 1970, after which Congress enacted implementing legislation, codified at Chapter 2 of the FAA. *Id.* at 439. By its terms, the New York Convention applies to any "arbitration agreement … arising out of a legal

relationship, whether contractual or not, which is considered as commercial," unless that relationship is "entirely between citizens of the United States" and does not have some "reasonable relation[ship] with one or more foreign states." 9 U.S.C. § 202. In other words, "any commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the Convention." *Jain v. de Méré*, 51 F.3d 686, 689 (7th Cir. 1995).

The New York Convention plainly applies to the TOS's arbitration agreement. The Convention's language focuses on the citizenship of the parties to *the relationship* from which an arbitration agreement arose. Here, to use the Anchor Protocol, each Plaintiff entered into an arbitration agreement with TFL. The commercial relationships out of which those agreements arose are thus the relationships between Plaintiffs and TFL pertaining to Plaintiffs' use of the Interface and the Anchor Protocol. Each Plaintiff is a United States citizen, A89 (¶¶ 12-15), but TFL is considered a Singaporean citizen because it is "incorporated in Singapore," A155 (§ 22); *see* 9 U.S.C. § 202. Accordingly, the commercial relationship from which each arbitration agreement arose was *not* "entirely between citizens of the United States." 9 U.S.C. § 202. The New York Convention therefore applies.

2. The district court was wrong to question the applicability of the New York Convention. According to the district court, "it is not at all clear" that the New York Convention applies in this case because "*this* dispute"—*i.e.*, the disputes between Defendants and each Plaintiff—"is among domestic parties" and "is domestic

in nature." A14-15 (emphasis added). But that's irrelevant. As mentioned, the Convention's language focuses on one thing: the commercial relationship from which the arbitration agreement arose. Here, the relevant relationships are those between TFL and each Plaintiff—the only relationships from which an agreement to arbitrate arose—so the New York Convention applies. Any contrary interpretation contradicts the relevant text, and would also lead to the strange result that the law that governs an international arbitration agreement depends on who happens to be trying to enforce it.[10]

Tellingly, the plaintiffs in a parallel securities class action against several of the same defendants did "not [even] dispute," and the district court there held, "that the arbitration clause in the Anchor TOS involves an international agreement governed by the New York Convention." *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 708-09 (N.D. Cal. 2024), *aff'd*, Nos. 24-670, 24-2489, 2025 WL 215519, (9th Cir. Jan. 16, 2025), *pet. for cert. filed*, No. 24-1266 (June 10, 2025); *supra* at 29 n.7. There is no sound basis for the district court's refusal to apply the New York Convention to a motion to compel arbitration filed under the exact same agreement.

[10] Aside from being legally irrelevant, the district court's comment about the domestic nature of the dispute between Plaintiffs and Defendants is inaccurate. While Plaintiffs tried mightily to pretend the dispute is all about them and Defendants, their entire complaint rests on allegations of collusive misconduct between Defendants and *foreign actors*: TFL, a Singaporean company, and Do Kwon, a South Korean national. *Supra* at 11-14; *infra* at 44-50. Moreover, the Jump entity that engaged in the alleged cryptocurrency trading that constitutes much of Defendants' alleged wrongdoing is a non-U.S. affiliate. *See* A82.

### B. Federal Common Law Supplies The Applicable Equitable-Estoppel Standard

Because the relevant arbitration agreement is governed by the New York Convention, Supreme Court precedent dictates that federal law supplies the standard for determining whether Defendants can compel arbitration of Plaintiffs' claims under equitable-estoppel principles. The district court made another error in concluding that state law supplies the relevant standard even if the relevant arbitration agreement is governed by the New York Convention.

1. In *Boyle v. United Technologies Corp.*, the Supreme Court established a two-part test for determining whether federal common law displaces state law. 487 U.S. 500, 506-07 (1988). The first question is whether a "uniquely federal interest" is implicated. *Id.* at 507. The second question is whether "application of state law would 'frustrate specific objectives' of federal legislation." *Id.* (citation omitted). If the answer to both questions is yes, then federal common law—not state law—applies. Here, the answer to both questions is a resounding yes.

a. What law applies to questions of nonsignatory enforcement of agreements governed by the New York Convention implicates a "quintessential 'uniquely federal interest.'" *Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, 2022 WL 2643936, at *6 (11th Cir. July 8, 2022) (Tjoflat, J., specially concurring) (quoting *Boyle*, 487 U.S. at 507).[11] The Supreme Court has emphasized

[11] The Eleventh Circuit majority resolved the case on other grounds and did not reach the question of what body of law should supply the equitable-estoppel standard for nonsignatory enforcement of arbitration agreements governed by the New York Convention. *Outokumpu Stainless,* 2022 WL 2643936, at *3.

that the "principal purpose" in adopting and implementing the New York Convention "was to encourage the recognition and enforcement of arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). This Court has likewise stressed that "the Convention and its implementing federal legislation express a clear federal interest in uniform rules by which agreements to arbitrate will be enforced." *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 579 (7th Cir. 2007).

This interest is "more than a generalized federal interest in uniformity," which may not be sufficient to displace state law. *Id.* "The whole goal of the New York Convention is to standardize the enforcement of international arbitration agreements," and because "[t]he New York Convention is an international treaty with international obligations … there is a strong federal interest in making sure that the United States lives up to its treaty obligations." *Outokumpu Stainless*, 2022 WL 2643936, at *6 (Tjoflat, J., specially concurring). Thus, "[t]he uniformity at issue here is one that implicates the very specific interest of the federal government in ensuring that its treaty obligations to enforce arbitration agreements covered by the Convention finds reliable, consistent interpretation in our nation's courts." *Certain Underwriters*, 500 F.3d at 579. A threat to this particularized interest in uniformity demands application of federal common law, not state law.

b. Applying state law to the question of nonsignatory enforcement would severely "'frustrate'" this "uniquely federal interest" in uniform rules pertaining to arbitration agreements governed by the Convention. *Boyle*, 487 U.S. at 507 (citation omitted). A regime under which "each state" is allowed "to impose its own test for threshold questions of arbitrability would create an unmanageable tangle of arbitration law in the United States, lead to forum shopping, and frustrate the uniform standards the New York Convention and Chapter 2 of the FAA were enacted to create." *Outokumpu Stainless,* 2022 WL 2643936, at *6 (Tjoflat, J., specially concurring).

This Court's decision in *Certain Underwriters* is instructive. There, the Court held that "federal law"—not "parochial rules" of state law—"must govern" the "interpret[ation] [of] a contractual deadline" in a contract governed by the Convention. 500 F.3d at 580. The Court explained that applying a patchwork of state rules to arbitration agreements governed by the Convention "would frustrate one of the *primary* objectives of the United States in becoming a signatory to the Convention: securing uniform standards by which agreements to arbitrate international disputes are governed." *Id.* The Court further made clear that this very logic applies to *all* questions related to agreements governed by the Convention—"whether the question be arbitrability or enforcement or some other question." *Id.* at 577-78. Accordingly, federal common law should govern questions of whether nonsignatories can enforce an arbitration agreement based on equitable estoppel (or other background principles of contract law).

Indeed, the Ninth Circuit relied on this Court's reasoning in *Certain Underwriters* to conclude that "'federal substantive law'" governs "the arbitrability of federal claims by or against nonsignatories to an arbitration agreement." *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021). And, as the Ninth Circuit noted, that conclusion "comports with First, Second, and Fourth Circuit decisions applying federal common law to threshold issues of arbitrability in New York Convention cases." *Id.* at 1168 n.1; *see Smith/Enron Cogeneration Ltd. P'Ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 96 (2d Cir. 1999) (recognizing "compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable" to nonsignatory-enforcement questions), *abrogated on other grounds by Granite Rock*, 561 U.S. 287 (2010); *Int'l Paper Co. v. Shwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416-17 & n.4 (4th Cir. 2000) ("look[ing] to" federal law "to resolve" whether "a nonsignatory" was "bound by" an arbitration agreement); *InterGen N.V. v. Grina*, 344 F.3d 134, 143, 145-46 (1st Cir. 2003) (applying "uniform federal standards" to nonsignatory-enforcement questions). This Court should not deviate from the rationale of *Certain Underwriters* and those well-reasoned decisions here.

This case highlights the risk of disuniformity that the district court's rule would create. Under Illinois law, a party invoking equitable estoppel "must have relied upon the acts or representations of the [party against whom equitable estoppel is being invoked] and have had no knowledge or convenient means of knowing the [true] facts" related to the other party's act or representations, and "such reliance

must have been reasonable." A18 (citation omitted); *Blisset v. Blisset*, 526 N.E.2d 125, 128 (Ill. 1988). But "[m]any other states" apply a different test. *Reeves v. Enter. Prods. Partners, LP*, 17 F.4th 1008, 1012-13 (10th Cir. 2021) (contrasting Illinois's approach with other states' approaches). Rather than requiring reliance on a signatory's acts or representations, other states apply equitable estoppel when "the signatory raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Id.* at 1013 (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009))); *see also Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 707 n.5 (9th Cir. 2024) (recognizing that similar standard applies under "California contract law"). Unless courts apply a uniform federal standard, motions to compel arbitration of identical claims brought by identical plaintiffs under identical international arbitration agreements would be resolved differently depending on which state's or country's law governs the equitable-estoppel inquiry. That is antithetical to the New York Convention's objectives.

2. Against all this, the district court erred in refusing to apply federal common law to the question of nonsignatory enforcement.

a. The district court barely grappled with the Supreme Court's *Boyle* test or its application to the question at hand. Instead, in rejecting the application of federal common law, the district court relied exclusively on the "'fundamental principle' that a 'nonparty's right to enforce an arbitration agreement is governed by

state law.'" A16 (quoting *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021)). But that principle was articulated in cases involving contracts where no party contended that the New York Convention applied. *See, e.g.*, *Sosa*, 8 F.4th at 637; A13-14. In those circumstances, the Supreme Court has explained that state law governs questions of nonsignatory enforcement. *Arthur Andersen*, 556 U.S. at 630-31. By contrast, the Supreme Court has expressly declined to address "which body of law governs" questions of nonsignatory enforcement in agreements subject to the New York Convention. *GE Energy*, 590 U.S. at 445.

The district court nevertheless refused to "depart" from state-law principles "without a clearer instruction from the Seventh Circuit to do so." A16. But the district court failed to recognize that *Certain Underwriters* provides just "such [a] directive" to apply federal common law. A16. Although *Certain Underwriters* did not address whether federal common law should apply to the specific question of nonsignatory enforcement, its explanation of the need for uniformity with respect to "disputes arising under agreements governed by the Convention" is directly on point. 500 F.3d at 579. As this Court acknowledged, its rationale in applying federal common law to the issue in that case naturally extends to all types of questions, including questions of "arbitrability or enforcement." *Id.* at 577-78; *supra* at 39. That is why both the Ninth Circuit and Judge Tjoflat (in a separate concurring opinion) cited *Certain Underwriters* in support of their conclusions that federal common law should govern questions of nonsignatory enforcement under the test set forth in *Boyle*. *Setty*, 3 F.4th at 1168; *Outokumpu Stainless,* 2022 WL 2643936, at *6 (Tjoflat,

J., specially concurring); *see also MouseBelt Labs Pte. Ltd. v. Armstrong*, 674 F. Supp. 3d. 728, 738-39 (N.D. Cal. 2023) (agreeing with Judge Tjoflat's conclusion that "federal common law displaced state law as to the question of whether the dispute was arbitrable under the doctrine of equitable estoppel").

The Ninth Circuit and Judge Tjoflat are correct, and the district court was not: The rationale of *Certain Underwriters* compels the application of federal law to nonsignatory-enforcement questions.

b. The district court further justified its decision to apply Illinois law by explaining that "it would put the cart before the horse to apply federal common law based on a contract that plaintiffs say they never intended to enter with defendants." A15. That justification fails for two independent reasons. First, it ignores that, as noted above, the New York Convention is concerned with the legal relationship from which the arbitration agreement arose, rather than the status of the parties to the dispute at issue. Accordingly, federal common law must apply because signatory TFL is a citizen of Singapore. Second, the district court's explanation misapprehends what it means for a nonsignatory to enforce an arbitration agreement against a signatory based on equitable estoppel. Such enforcement does *not* mean that the signatory *intended* to enter into an arbitration agreement with the nonsignatory. To the contrary, the doctrine of equitable estoppel recognizes that, under some circumstances, a nonsignatory may enforce contractual obligations against a signatory even though the signatory has no contract with the nonsignatory. Because the arbitration agreement that Plaintiffs are attempting to sidestep is subject to the

New York Convention and federal law, the federal common law test for equitable estoppel applies.

### C. Under The Federal Common Law Test For Equitable Estoppel, Plaintiffs' Claims Must Be Arbitrated

The district court's failure to analyze Defendants' equitable-estoppel argument under the federal common law standard independently requires reversal of the district court's decision. But this Court may resolve Defendants' motion to compel arbitration without a remand if it wishes, because the federal common law standard clearly forecloses Plaintiffs' effort to avoid arbitration of their claims. *See Ambrosia Land Invs., LLC v. Peabody Coal Co.*, 521 F.3d 778, 786 (7th Cir. 2008) (court of appeals may resolve "merits of legal issues which were not addressed by the district court" based on undisputed facts). Plaintiffs allege that Defendants engaged in interdependent and concerted misconduct with TFL, a signatory to the arbitration agreement. Accordingly, under the federal standard for equitable estoppel, Defendants' motion to compel arbitration should have been granted.

1. Under the federal test for equitable estoppel, a signatory to a written contract containing an arbitration clause cannot avoid arbitration with a nonsignatory when the signatory brings a claim "rais[ing] allegations of … substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *MS Dealer*, 177 F.3d at 947 (ellipses in original) (citation omitted); *see also Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355,

373-75 (4th Cir. 2012) (same); 21 Williston on Contracts § 57:19 (4th ed. 2025, update); *cf. Sosa*, 8 F.4th at 641-42 (acknowledging "[t]his federal standard").[12]

This rule prevents a plaintiff from avoiding arbitration of claims against nonsignatories that "are based on the same facts and are inherently inseparable" from claims against signatories that would be subject to arbitration. *MS Dealer*, 177 F.3d at 948 (citation omitted). Equitable estoppel thus certainly applies where the "*same* allegations" support the "*same* claims" against a nonsignatory and a signatory alike. *Aggarao*, 675 F.3d at 373-75; *Kelly v. K12 Inc.*, 854 F. App'x 963, 965 (10th Cir. 2021) (equitable estoppel required plaintiff to arbitrate where "claims against [nonsignatories] were not merely interdependent, but based on the exact same operative facts as her claims against" signatory).[13] A contrary rule "would allow for arbitration agreements to be effectively eviscerated via conspiracy counts and

[12] District courts in this Circuit also have repeatedly held that equitable estoppel applies under federal common law where a plaintiff alleges that the nonsignatory defendant entered into a scheme with a signatory. *See*, *e.g.*, *Leff v. Deutsche Bank AG*, No. 08-CV-733, 2009 WL 1380819, at *5 (N.D. Ill. May 14, 2009) (applying equitable estoppel because "Plaintiffs' claims [were] premised on the theory that Deutsche Bank and others … entered into a conspiracy and/or engaged in a scheme to develop and market 'illegal' tax strategies"); *Holden v. Deloitte & Touche LLP*, 390 F. Supp. 2d 752, 764-67 (N.D. Ill. 2005) (applying federal law to find arbitration was properly compelled under "concerted misconduct" theory where the complaint alleged all defendants' conduct shared the central goal of "effectuation of the S[tock] P[urchase] A[greement]"); *Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1005 (N.D. Ill. 2001) (compelling arbitration with nonsignatories and stating that "plaintiffs claim that all the defendants conspired to induce them to participate in the roll-up .... The claims thus raise allegations of substantially interdependent and concerted misconduct by both the signatory (EPS) and the non-signatories").

[13] The fact that the federal test for equitable estoppel focuses on these questions of enforceability and scope further underscores that an arbitrator should resolve the parties' equitable-estoppel dispute where, as here, an arbitration agreement delegates all questions of arbitrability to the arbitrator. *Supra* at 19-33.

allegations of concerted misconduct that in effect would put a signatory on trial, notwithstanding the agreement to arbitrate." *Holden v. Deloitte & Touche LLP*, 390 F. Supp. 2d 752, 767 (N.D. Ill. 2005); *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) (explaining that it would be "especially inequitable" to allow plaintiff-signatory "to avoid [arbitration] agreement by bringing the action against a non-signatory charged with acting in concert with [a] non-defendant signatory").

2. Plaintiffs must arbitrate their claims because they depend on allegations of interdependent and concerted misconduct by nonsignatories and a signatory. Under these circumstances, Plaintiffs must abide by their agreement to arbitrate with Defendants' supposed co-conspirator, TFL.

a. Plaintiffs' claims are replete with allegations of interdependent, concerted misconduct by Defendants and TFL. From the first paragraph to the last, Plaintiffs' Amended Complaint contends that Defendants "secretly schemed" with TFL and aided and abetted TFL's alleged manipulation of the price of commodities. *See, e.g.*, A85-87, 103, 118, 133, 135-39 (¶¶ 1, 4, 74, 103, 156, 163, 170, 175-77). To bolster their argument that Defendants engaged in "misconduct," Plaintiffs invoke allegations made against TFL in civil-enforcement and criminal cases suggesting that Defendants "colluded with" and provided "assistance" to TFL. A88-89 (¶¶ 9-10). Plaintiffs also repeatedly contend that Defendants and TFL worked together to hide the alleged restoration of UST's peg to $1 from the public. *See, e.g.*, A108-10, 112-18

(¶¶ 86-88, 93-94, 96-103). And Plaintiffs' claims for relief all depend on their assertions regarding interdependent and concerted misconduct.

Plaintiffs ultimately assert that Defendants (1) manipulated commodity prices by not correcting TFL's "misstatement[s]" and "enter[ing] into a secret agreement with … TFL" to manipulate prices, A129-36 (¶¶ 140-67) (Count I); (2) "aided" and "abetted" signatory TFL's commodity price manipulation, A136-40 (¶¶ 168-181) (Count II); and (3) were unjustly enriched because Plaintiffs "reli[ed] on public statements by" both signatories and nonsignatories, A140-41 (¶¶ 182-87) (Count III). These allegations of "pre-arranged, collusive behavior" by signatory TFL and the nonsignatory Defendants make this case a paradigmatic example of when equitable estoppel is warranted. *MS Dealer*, 177 F.3d at 948 (citation omitted).

b. Requiring Plaintiffs to arbitrate under these circumstances is entirely fair. If Plaintiffs had brought the exact same claims based on the same allegations against TFL, TFL could have compelled arbitration pursuant to the TOS. *See Aggarao*, 675 F.3d at 373-75. This is because Plaintiffs' allegations of interdependent and concerted misconduct by Defendants and TFL easily fall within the TOS's expansive arbitration provision. The arbitration provision applies to "[a]ny claim or controversy arising out of or relating to the Interface, this Agreement, … or any other acts or omissions for which you may contend that [TFL is] liable." A154 (§ 18). The terms "arising out of" and "relating to" are "extremely broad and capable of an expansive reach." *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909-10 (7th Cir. 1999). When an arbitration agreement uses such "[b]road" language, it

"necessarily create[s] a presumption of arbitrability." *Id.* at 910. This language encompasses "claims [even] tangentially related to the agreements." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1036 (7th Cir. 2012) (quoting *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002)); *see also id.* at 1035-36 (compelling arbitration of claims based on joint "conduct," "aiding and abetting," and "unjust enrichment" based on "profits … reaped as a product of [a] fraud").

Plaintiffs' claims fall within the arbitration clause's scope for three reasons. First, Plaintiffs' theory that Defendants and TFL schemed together to deceive alleged investors certainly concerns conduct for which Plaintiffs "may contend" that TFL is liable. Indeed, Plaintiffs' aiding-and-abetting claim *requires* Plaintiffs to prove TFL committed a primary violation of the commodities laws. *See Damato v. Hermanson*, 153 F.3d 464, 470 (7th Cir. 1998) (concerning the CEA, stating, "[b]y definition, an aider and abettor knowingly contributes to the principal's violation, rather than committing an independent violation of its own"); *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996) ("In order to recover damages from a secondary party in an action for 'aiding and abetting' liability under the Commodities Exchange Act, a plaintiff must first prove that a primary party committed a commodities violation.").

Second, Plaintiffs' claims also "aris[e] out of or relat[e] to the [Anchor Protocol's] Interface." A154 (§ 18). Plaintiffs allege that approximately 95% of their "UST losses are attributable to UST tokens that [they] loaned to the 'Anchor Protocol.'" A126 (¶ 130); *supra* at 11. That is because Plaintiffs "loaned [the majority

of their UST tokens] to the 'Anchor Protocol'" and, more broadly, "approximately three-quarters of all UST holdings were held in such manner by the Class." *Id.* Plaintiffs' attempt to recover for these losses cannot be separated from the Interface they used to make these deposits.

Third, Plaintiffs' claims "aris[e] out of or relat[e] to" the TOS. A154 (§ 18). Plaintiff Kim previously alleged that "TFL publicly touted the Anchor Protocol … as 'a principal-protected savings product with instant withdrawals and a stable interest rate.'"[14] A50-51 (¶ 45); *see also* A126 (¶ 130). Kim emphasized the Anchor Protocol's interest rate because he sought to represent a class of purchasers who lost money on "UST *or* aUST" based on Jump Trading and Kariya allegedly "propping up the price of" both assets. A57-58, 61-62, 65 (¶¶ 64, 73, 87) (emphasis added). But after Jump Trading and Kariya moved to compel arbitration of Kim's claims, Plaintiffs changed their tune. This is because the TOS directly address that interest rate. Specifically, Plaintiffs agreed that the 20% interest rate was "not a promise" or "guarantee" but rather "a forward-looking projection based on a good faith belief of how to reasonably project results over the relevant period ... subject to numerous assumptions, risks and uncertainties," and that "[e]ven if the Rate is achieved as projected," they "may still suffer a financial loss." A152 (§ 10); *see also* A153 (§ 14) (stating that "markets for … digital assets" may be affected by "technology" or "speculation"). Plaintiffs cannot

[14] Although Plaintiffs amended their complaint to downplay the role of aUST and the Anchor Protocol in their claims, A126-27 (¶¶ 130-31), this Court is "not free to *disregard*" those prior allegations, which directly implicate the TOS and the arbitration agreement, *Bufkin Enters., L.L.C. v. Indian Harbor Ins. Co.*, 96 F.4th 726, 732 (5th Cir. 2024).

avoid arbitration of claims that rely on the Anchor Protocol's interest rate, which is governed by the TOS, simply because they have chosen not to sue TFL.

"It is of no moment that" Plaintiffs are not "pursuing claims" against TFL in this case. *Bufkin Enters., L.L.C. v. Indian Harbor Ins. Co.*, 96 F.4th 726, 732 (5th Cir. 2024). Because Plaintiffs "raise[] allegations of substantially interdependent and concerted misconduct by both a non-signatory" and a "signator[y]," they must arbitrate claims in accordance with their agreement. *Id.* Indeed, allowing Plaintiffs to sidestep their agreement to arbitrate with TFL would deny TFL the benefit of its arbitration clause because, as Jump Trading's alleged joint tortfeasor, TFL could be brought into the litigation based on a claim for contribution. As the Fifth Circuit has recognized, that outcome is "especially inequitable" because, despite having bargained for arbitration, the signatory "becomes a party [to litigation], with resulting loss, *inter alia*, of time and money because of its required participation in the proceeding." *Grigson*, 210 F.3d at 528. Thus, Plaintiffs' suit is exactly what the equitable-estoppel doctrine is designed to prevent.

## CONCLUSION

The district court's order should be reversed.

Dated: August 13, 2025

Respectfully submitted,

*/s/ Paul M. Krieger*
Paul M. Krieger
*Counsel of Record*
Jonathan F. Bolz
KKL LLP
350 Fifth Avenue
Suite 7710
New York, NY 10118
(212) 390-9550

*Counsel for Defendant-Appellant*
*William DiSomma*

*/s/ Aitan D. Goelman*
Aitan D. Goelman
*Counsel of Record*
R. Miles Clark
Christopher R. MacColl
ZUCKERMAN SPAEDER LLP
2100 L Street, NW
Suite 400
Washington, DC 20037
(212) 778-1800

*Counsel for Defendant-Appellant*
*Kanav Kariya*

*/s/ Roman Martinez*
Roman Martinez
Melissa Arbus Sherry
David Steinbach
Uriel Hinberg
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Jonathan D. Cogan
*Counsel of Record*
Steven W. Perlstein
Igor Margulyan
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
(212) 488-1200

Peter Trombly
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Defendants-Appellants*
*Jump Trading, LLC and*
*Jump Crypto Holdings LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) and Seventh Circuit Rule 32(c) because it contains 13,244 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Seventh Circuit Rule 32(b) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using a proportionally spaced 12-point font.

Dated: August 13, 2025

*/s/ Roman Martinez*
Roman Martinez

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2025, I caused the foregoing Opening Brief and Required Short Appendix for Defendants-Appellants to be served by electronic means through the Court's CM/ECF system on counsel for all parties who are registered CM/ECF users.

Dated: August 13, 2025

*/s/ Roman Martinez*
Roman Martinez

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Rule 30(d) of the Circuit Rules of the United States Court of Appeals for the Seventh Circuit, I certify the attached Required Short Appendix and the Separate Appendix contain all materials required by Rule 30(a) and Rule 30(b) of the Circuit Rules.

Dated: August 13, 2025

*/s/ Roman Martinez*
Roman Martinez

## ADDENDUM

## Pursuant to Federal Rule of Appellate Procedure 28(f)

## TABLE OF CONTENTS

**Page**

9 U.S.C. § 202 .......... ADD-1

## 9 U.S.C. § 202

### § 202 Agreement or award falling under the Convention.

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

# REQUIRED SHORT APPENDIX

## TABLE OF CONTENTS

### Required Short Appendix—Pursuant to 7th Cir. R. 30(a)

CIRCUIT RULE 30(d) STATEMENT: Defendants-Appellants' Required Short Appendix and Separate Appendix include all the materials required by Circuit Rule 30(a) and (b).


| **Page** | **Docket No.** | **Description** |
|---|---|---|
| A1 | 98 | Memorandum Opinion and Order (May 9, 2025) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

TAEWOO KIM, KASHYAP PATEL, KERRY WOOLLEY, and KEN WORSHAM, *individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC (f/k/a 1HOLD1 LLC), KANAV KARIYA, and WILLIAM DISOMMA,

Defendants.

Case No. 23 CV 2921

Hon. Georgia N. Alexakis

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Taewoo Kim, Kashyap Patel, Kerry Woolley, and Ken Worsham bring this suit individually and on behalf of a putative class against Jump Trading, LLC, its cryptocurrency arm Jump Crypto Holdings, LLC, and two of Jump Crypto's executives. They allege that defendants violated state and federal law by scheming with Terraform Labs Pte. Ltd. ("TFL") to manipulate the price of a stablecoin called TerraUSD ("UST"). Defendants now move to compel arbitration pursuant to an agreement plaintiffs signed with TFL. For the reasons set forth below, the Court denies defendants' motion.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the enforceability, validity, and interpretation of commercial contracts involving interstate commerce. *See* 9 U.S.C.

§ 1 *et seq.*; *see also Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). Before ordering arbitration, it is a court's role to determine whether a valid contract exists. *See Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010). At the same time, "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). When parties agree to arbitrate arbitrability, a court may not disregard this "additional, antecedent agreement," even when the argument for arbitration appears "wholly groundless." *Id.* at 68–72.

To determine whether parties have agreed to arbitrate questions of arbitrability, there must be "clear and unmistakable evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (cleaned up) (quoting *AT&T*

*Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). The party seeking to compel arbitration bears the burden of showing arbitration is the appropriate venue. *See A.D. v. Credit One Bank, NA*, 885 F.3d 1054, 1063 (7th Cir. 2018).

**FACTUAL BACKGROUND**[1]

In 2018, Do Kwon and his company TFL began creating the Terra blockchain. [60] ¶ 43. The next year, TFL began to sell UST and its related digital asset, LUNA. *Id.* ¶¶ 2, 43, 47. LUNA was the native token of the Terra blockchain. *Id.* ¶ 43. UST, by contrast, was designed as a "stablecoin," a type of digital asset intended to be more stable than other cryptocurrencies by pegging its value to another asset. *Id.* ¶¶ 2, 38, 45. UST was continuously pegged to the U.S. dollar, which, according to plaintiffs, was meant "to appeal to the public as a safe crypto asset to serve as a store of value and medium of exchange." *Id.* ¶ 2; *see also id.* ¶ 44. However, instead of being backed by actual dollars, TFL maintained UST's price by minting and burning UST in parallel with LUNA. *Id.* ¶ 45; *see also id.* ¶ 38 (describing "one of two ways" that "a stablecoin's peg can be maintained").

Jump Crypto was one of TFL's early partners. *Id.* ¶¶ 3, 48. From November 2019 to September 2020, it entered into a series of agreements with TFL to borrow tens of millions of LUNA tokens and provide "market-making" services to TFL in exchange for the opportunity to buy discounted LUNA tokens. *Id.* ¶¶ 3, 50–57. In May

[1] Resolving this motion does not require a thorough recounting of the underlying facts, but to provide some context for the parties' dispute, the Court sets out key allegations from plaintiffs' amended complaint. The Court accepts those allegations as true only for purposes of this motion.

2021, TFL's algorithm pegging UST to $1 failed, and UST's market price fell. *Id.* ¶¶ 4, 73.

In response, plaintiffs contend TFL and Kwon "secretly schemed with Defendants to manipulate and pump the market price for UST by making secret, coordinated trades to prop up UST to its $1 peg." *Id.* ¶ 4. As part of this scheme, plaintiffs further contend, Jump[2] bought more than 62 million UST tokens in May 2021, which "artificially inflate[d]" UST's price to $1 and "caus[ed] a corresponding rise in the price of UST." *Id.* To reward Jump for this alleged manipulation of the UST market, "Kwon agreed to modify TFL's prior agreements with Jump and instead unconditionally sell 65 million LUNA tokens to Jump at a greater than 99% discount from their then-current market price." *Id.* ¶ 5, *see also id.* ¶¶ 77–79, 105. Plaintiffs say Jump later sold these LUNA tokens for a $1.28 billion profit. *Id.* ¶¶ 5, 84, 106.

According to plaintiffs, defendants "actively concealed and aided and abetted TFL's and Kwon's concealment of Jump's May 2021 intervention to maintain the artificial $1 peg for UST." *Id.* ¶ 7; *see also id.* ¶¶ 111–14. By May 2022, the price of UST collapsed entirely, causing an alleged loss of nearly $19 billion in UST holdings, including a loss of more than $2 million in UST for the four named plaintiffs. *Id.* ¶¶ 7–8, 109. Plaintiffs maintain that, as a whole, the class sustained "billions of dollars in actual damages under applicable law." *Id.* ¶¶ 8, 128.

In May 2023, Kim brought a putative class action complaint against Jump Trading and Kanav Kariya, the president of Jump Crypto, alleging violations of the

[2] As plaintiffs do in their amended complaint, the Court uses "Jump" here to refer collectively to defendants Jump Trading, LLC, and Jump Crypto. [60] at 1.

Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, Commodity Futures Trading Commission ("CFTC") regulations, 17 C.F.R. § 180, and common law unjust enrichment. *See generally* [1]. In August 2024, plaintiffs brought an amended class action complaint adding Patel, Woolley, and Worsham as plaintiffs and Jump Crypto and William DiSomma—co-founder and co-owner of Jump Trading—as defendants. *See generally* [60]; *see also id.* ¶ 19.

The next month, defendants moved to compel arbitration under an agreement to arbitrate between plaintiffs and TFL. [82]. The operative agreement to which defendants point appears in the terms of service for the "Anchor Protocol," which is a feature of the Terraform blockchain. *See generally* [83-1] at Ex. A.[3] Although defendants were not a party to the Anchor Protocol's terms of service, they nonetheless contend that equitable estoppel principles require plaintiffs to submit this dispute to arbitration.

[3] The Anchor Protocol is a "'savings protocol' created by TFL that permitted users to lend their UST to borrowers at an interest rate through a self-described 'money market' established by TFL." [60] ¶ 130; *see also id.* ¶ 29. Plaintiffs' original complaint stated that of the nearly 19 billion UST tokens in circulation, 14 billion were deposited in the Anchor Protocol. [1] ¶ 72. The original complaint also specified that Kim, the only named plaintiff at that time, completed various transactions via the Anchor Protocol. *Id.* ¶¶ 83–84. Based on their amended complaint, plaintiffs disclaim any effort to recover losses "relat[ing] to the failure of the Anchor Protocol," although Plaintiffs still assert that their claims remain based "on the devaluation of their UST," including "UST over which the Plaintiffs retained title but that they had loaned to the Anchor Protocol." [84] at 4; *see also* [60] ¶¶ 129–31. To support their motion to compel—and, more specifically, to establish that plaintiffs are bound by the Anchor Protocol's terms of service—defendants rely on a declaration from Arrash Chris Amani, TFL's former Chief Operating Officer and Chief Financial Officer. *See generally* [83-1]. In his declaration, Amani describes how prospective Anchor Protocol users were required to accept its terms of service, including its "mandatory agreement to arbitrate all disputes with TFL." *Id.* ¶ 5. Plaintiffs argue that Amani's declaration constitutes inadmissible evidence and that, as a result, defendants cannot establish that plaintiffs are bound by the Anchor Protocol's terms of service. [84] at 5–7. Because it denies defendants' motion on other grounds, the Court does not address the parties' dispute over the admissibility of Amani's declaration. Plaintiffs otherwise do not contend that the delegation-clause language that appears in the Anchor Protocol's terms of service, *see infra*, is inaccurate.

## DISCUSSION

Defendants' motion to compel presents three issues: (1) whether the Court or the arbitrator should determine if plaintiffs' claims are arbitrable given defendants' status as non-signatories to the Anchor Protocol's terms of service; (2) assuming that predicate determination is one for the Court, whether it should apply equitable estoppel principles from state law or federal common law to determine whether non-signatory defendants can compel arbitration against plaintiffs; and (3) again assuming that the Court should decide the predicate question, whether defendants actually may compel arbitration under equitable estoppel principles. The Court considers each issue in turn.

### A. Courts Decide Whether Non-Signatories Can Compel Arbitration.

The parties first dispute whether the Court or an arbitrator should decide if defendants, as non-signatories to the Anchor Protocol's terms of service, can compel arbitration pursuant to plaintiffs' agreement with TFL. Defendants argue that the arbitrator should decide the question because the "Anchor [terms of service] include a broad arbitration clause as well as a clear and unmistakable delegation clause." [82] at 1–2. Plaintiffs maintain that this question is one for the Court.

Neither party disputes that the Anchor Protocol's terms of service delegate arbitrability questions to the arbitrator. The relevant provision reads:

> Any claim or controversy arising out of or relating to the Interface, this Agreement, including any question regarding this Agreement's existence, validity or termination, or any other acts or omissions for which you may contend that we[4] are liable, including (but not limited to) any claim or controversy as to arbitrability ("Dispute"), shall be

[4] The terms of service define "we" as "Terraform Labs PTE, Ltd." [83-1] at 6.

> referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules")[.]
>
> You understand that you are required to resolve all Disputes by binding arbitration. The arbitration shall be held on a confidential basis before one or three arbitrators, who shall be selected pursuant to SIAC Rules. The seat of the arbitration shall be determined by the arbitrator(s); the arbitral proceedings shall be conducted in English. The applicable law shall be Singapore law.

[83-1] at 12. Because this provision clearly delegates "any claim or controversy as to arbitrability" to an arbitrator, the Court agrees with defendants that this provision contains the sort of clear and unmistakable intent ordinarily required to delegate questions of arbitrability to an arbitrator. *See First Options*, 514 U.S. at 944; *see also Henry Schein*, 586 U.S. at 68 (parties may agree to delegate arbitrability questions to arbitrator). If plaintiffs were suing TFL, this provision would go a long way toward resolving a motion to compel arbitration. But plaintiffs are not suing TFL, and Jump and the other defendants in this matter were not parties to the contract between plaintiffs and TFL.

As another court in this district already has observed, that defendants are non-signatories attempting to enforce the arbitration agreement "presents a logical conundrum." *O'Connor v. Ford Motor Co.*, No. 19-CV-5045, 2023 WL 130522, at *5 (N.D. Ill. Jan. 9, 2023) (cleaned up). Before compelling arbitration, it is the province of a court to determine "whether a contract exists at all." *Id.* (quoting *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021)). If "the nonsignatories are not parties to the contract, then the Plaintiff has no agreement with them," and even the broadest of delegation clauses does not apply. *Id.* (quoting *Swiger*, 989 F.3d at 507). At the

same time, whether an arbitration agreement can be used to compel arbitration by a non-signatory defendant "is a question of the enforceability of the arbitration clause, as to that defendant." *Id.* (quoting *Swiger*, 989 F.3d at 507). And, because the Anchor Protocol's terms of service clearly delegate "*any* claim or controversy as to arbitrability," this seems at first glance like a question for the arbitrator. [83-1] at 12 (emphasis added).

Both things cannot be true. "Given this logical conundrum, it is not surprising that there is some inconsistency in the federal case law concerning who—the court or the arbitrator—decides a challenge to a non-signatory's standing to demand arbitration." *O'Connor*, 2023 WL 130522, at *5. Some circuits have held that whether a third party can compel arbitration under a plaintiff's arbitration agreement with another party is a question of enforceability for the arbitrator (assuming, of course, that there is a clear and unmistakable intent to delegate questions of arbitrability). *See, e.g.*, *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989).[5] Other circuits, meanwhile, view a non-signatory's ability to enforce an arbitration

[5] *See also Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 211 (2d Cir. 2005) (third-party's right to enforce arbitration agreement "is a matter of the Agreement's continued existence, validity and scope, and is therefore subject to arbitration under the terms of the arbitration clause"); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 852 (6th Cir. 2020) ("[T]he arbitrator should decide for itself whether [non-signatory] can enforce the arbitration agreement."); *Eckert/Wordell Archs., Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) ("Whether a particular arbitration provision may be used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability."); *Casa Arena Blanca LLC v. Rainwater by Est. of Green*, No. 21-2037, 2022 WL 839800, at *5 (10th Cir. Mar. 22, 2022) ("[T]he question of whether the Agreement should be enforced against Ms. Rainwater as a third-party beneficiary of that contract is one that should be decided by an arbitrator.").

agreement as a question of contract formation for courts. *See, e.g.*, *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 288 (4th Cir. 2023).[6]

The Seventh Circuit's opinion in *CCC Intelligent Solutions Inc. v. Tractable Inc.*, 36 F.4th 721, 723 (7th Cir. 2022), provides a way out of this conundrum. There, one of Tractable's employees entered into a contract with CCC Intelligent Solutions ("CCC") to access CCC's software and incorporate some of its algorithms into Tractable's product. *Id.* at 722–23. To conceal his association with Tractable, however, the employee entered into the contract using a false name—"JA Appraisal"—and provided false contact information. *Id.* at 722. When CCC sued Tractable, Tractable moved to compel arbitration pursuant to the contract between JA Appraisal and CCC. *See CCC Info. Servs. Inc. v. Tractable Inc.*, No. 18 C 7246, 2019 WL 2011092, at *1 (N.D. Ill. May 7, 2019). The district court held that the "dispute—whether plaintiff agreed to arbitrate with *Tractable*—[was] a dispute that can't logically be resolved by the arbitrators" because "the delegation clause cannot be enforced against plaintiff unless plaintiff agreed to arbitrate disputes with Tractable." *Id.* at *2 (cleaned up) (emphasis added). It further reasoned: "[T]he issue is not the effect of a contractual provision to which the parties agreed. … The issue is whether an agreement between plaintiff and Tractable exists at all," and thus it was an issue "for the court to decide." *Id.* The district court in *CCC* went on to conclude

[6] *See also Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398 (5th Cir. 2022) ("When a court decides whether an arbitration agreement exists, it necessarily decides its enforceability between parties. Therefore, deciding an arbitration agreement's enforceability between parties remains a question for courts."); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013) ("Given the absence of clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with nonsignatories, the district court had the authority to decide whether the instant dispute is arbitrable.").

that Tractable was not a party to the arbitration agreement and that it could not enforce the agreement under any theory of agency or equitable estoppel. *Id.* at *3–*4.

The Seventh Circuit affirmed. Although its analysis focused on the latter dispute (whether Tractable could enforce the agreement), the appeals court described the district court as having "appl[ied] the rule that a judge must decide whether the parties have agreed to arbitrate." *CCC*, 36 F.4th at 723 (citing *AT&T Techs.*, 475 U.S. at 643). It then affirmed the district court's subsequent conclusion that Tractable was not a party to (or beneficiary of) the contract between CCC and JA Appraisal. *Id.* at 724 ("The potential exception for third-party beneficiaries does not apply, which leaves the dominant rule. Tractable is not a party to this contract, so it cannot demand arbitration."). Even though the Seventh Circuit never explicitly addressed who should decide whether Tractable could enforce the contract, its answer was implicit in its approving description of the district court's approach to resolving Tractable's motion to compel.

Defendants contend that *CCC* is inapposite because "the appellant … argued that it could compel arbitration, not as a nonsignatory, but as the real party to the contract." [91] at 6. To be sure, the Seventh Circuit did focus its analysis on whether Tractable was a party to a contract signed by the non-existent "JA Appraisal." *CCC*, 36 F.4th at 723–24. But after it determined Tractable was not, in effect, a signatory, the appeals court also remarked that "[t]he potential exception for third-party beneficiaries [did] not apply" to enable Tractable to enforce the contract against CCC. *Id.* at 724. This statement went beyond whether Tractable itself was a party to the

contract; the court addressed whether Tractable could rely on an equitable doctrine to bind plaintiffs nonetheless. As a result, defendants' efforts to cast *CCC* in exceedingly narrow terms—as one focused purely on "contract formation rather than enforcement"—are less than convincing. [91] at 6. In any event, the underlying district court opinion unambiguously held that a court should decide whether Tractable as a non-signatory could compel arbitration under principles of agency and equitable estoppel. *See CCC*, 2019 WL 2011092, at *3–*4. And again, on appeal, the Seventh Circuit did not take any issue with the district court's approach. *See CCC*, 36 F.4th at 724.

Since the appeals court decision in *CCC*, district courts throughout the Seventh Circuit have relied on that decision to hold that whether a non-signatory can compel a party to arbitrate is not a question for an arbitrator. *See O'Connor*, 2023 WL 130522, at *6 (applying *CCC* to conclude that "the issue of whether Defendant has any right as a non-signatory to compel arbitration with Plaintiffs goes to contract formation and must be decided by the Court"); *Moomaw v. GeoSnapShot PTY LTD*, No. 3:23-CV-1321-DWD, 2025 WL 870319, at *3 (S.D. Ill. Mar. 20, 2024) (finding that "whether GeoSnap, a non-signatory to the liability agreements, can compel arbitration is a question of contract formation, which must be decided by the Court"); *see also Al-Nahhas v. Rosebud Lending LZO*, No. 22-CV-750, 2023 WL 5509320, at *8 (N.D. Ill. Aug. 25, 2023), *aff'd sub nom. Al-Nahhas v. 777 Partners LLC*, 129 F.4th 418 (7th Cir. 2025); *Angelilli v. Activision Blizzard, Inc.*, No. 23-CV-16566, 2025 WL 524276, at *2 (N.D. Ill. Feb. 18, 2025); *Kashkeesh v. Microsoft Corp.*, 679 F. Supp. 3d

731, 735 n.3 (N.D. Ill. 2023); *Giron v. Subaru of America, Inc.*, 2022 WL 17130869 (N.D. Ill. Nov. 21, 2022).[7]

This Court likewise takes its cue from *CCC* and holds that whether defendants as non-signatories to the Anchor Protocol's terms of service can compel arbitration with plaintiffs is a question for it to decide. As the Fifth Circuit persuasively reasoned in *Newman*, "deciding enforceability between the parties and an arbitration agreement's existence are two sides of the same coin" because "[w]hen a court decides whether an arbitration agreement exists, it necessarily decides its enforceability between parties." 23 F.4th at 398; *see also O'Connor*, 2023 WL 130522, at *6 ("The question of whether [a non-signatory] can enforce the arbitration provision in a contract to which it is not a party is not different from the question of whether an agreement to arbitrate exists between the plaintiff and [a non-signatory].") (quoting *Giron*, 2022 WL 17130869, at *4). Moreover, an "arbitrator cannot resolve any issues until the court has ascertained that there is an actual agreement" between the parties. *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022). Here, because there is no binding agreement between plaintiffs and defendants, "the breadth of a delegation is irrelevant." *Id.*; *see also Azuz v. Accucom Corp.*, No. 21-CV-1182, 2023 WL 2525486,

[7] As defendants accurately point out, other district courts in this Circuit have concluded differently. *See Matricciani v. Am. Homeowner Pres., Inc.*, 718 F. Supp. 3d 825, 839 (N.D. Ill. 2024); *Coons v. Yum! Brands, Inc.*, 672 F. Supp. 3d 626, 635 (S.D. Ill. 2023); *Reidt v. Advanced Mktg. & Processing, Inc.*, 2023 WL 8469772, at *2–*3 (W.D. Wis. Dec. 7, 2023). However, these decisions did not cite *CCC* nor consider how *CCC* bears on the issue of who decides whether a non-signatory to an agreement can compel a party to arbitrate. This Court's decision in *Woodard v. SmartMatch Ins. Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803 (N.D. Ill. Sept. 20, 2024), is also not instructive, notwithstanding plaintiffs' efforts to find support in it. The Court did not cite *CCC* there, but *Woodard* involved a factual dispute over whether a plaintiff ever actually agreed to arbitrate—not whether a non-signatory could compel arbitration based on equitable principles like estoppel. *See id.* at *2. *CCC* was therefore not relevant to that dispute.

at *6 (N.D. Ill. Mar. 15, 2023) ("The arbitrator can't decide *anything* unless the parties have agreed to arbitrate *something*. There is no chicken-and-the-egg problem when it comes to arbitration: an agreement to arbitrate must come before the question of arbitrability.").

For these reasons, the Court will decide whether defendants, as non-signatories, can compel plaintiffs to arbitrate. It turns to that question next.

**B. State-Law Equitable Estoppel Principles Apply.**

The parties dispute whether the Court should apply federal or state common law principles in deciding whether non-signatory defendants can compel plaintiffs to arbitrate. Defendants say the Court should look to federal common law principles, *see* [82] at 21, while plaintiffs contend that state law principles apply under binding Supreme Court and Seventh Circuit precedent, *see* [84] at 13.

Plaintiffs have the better argument. The Seventh Circuit has said repeatedly that, in the arbitration context, courts "must apply traditional state promissory estoppel principles to decide whether a non-party should be bound by the terms of another's contract." *Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870, 872 (7th Cir. 2018) (citing *Scheurer v. Fromm Fam. Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017)); *see also Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (reciting the "fundamental principle" that a "nonparty's right to enforce an arbitration agreement is governed by state law"); *Credit One Bank*, 885 F.3d at 1063 n.14 ("[T]he question whether a party is equitably estopped from denying the application of an arbitration

clause is a question of state contract law."). The Seventh Circuit has never limited this broad rule to arbitration provisions between domestic parties only.

Citing *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571 (7th Cir. 2007), defendants maintain that the outcome should be different for agreements that fall under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention"). [91] at 10–11. *Certain Underwriters* involved an arbitration agreement that, both parties agreed, fell under the auspices of the Convention and that contained no choice-of-law provision. 500 F.3d at 577. In those circumstances, the appeals court had to decide whether a state-specific exception should apply to extend an otherwise "clear contractual deadline[]" for appointing an arbitrator. *Id.* at 581; *see also id.* at 573–74. *Certain Underwriters* concluded it should not, holding that "the substantial federal interests in uniform interpretation of agreements under the Convention" justified applying a uniform federal rule of decision. *Id.* at 581; *see also id.* at 579 ("We conclude that the Convention and its implementing federal legislation express a clear federal interest in uniform rules by which agreements to arbitrate will be enforced.").

*Certain Underwriters* does not change the outcome here. Unlike the situation in *Certain Underwriters*, the parties here do not agree that their dispute is arbitrable, let alone that any agreement to arbitrate is governed by the Convention. Defendants contend the agreement falls under the Convention because TFL is not a United States citizen. [82] at 21 & n.15. Yet TFL is not a party here—*this* dispute is among domestic parties, *see* [60] at ¶¶ 12–19, so it is not at all clear that the Convention would apply.

Compared to *Certain Underwriters*, this dispute, as it stands, is domestic in nature. *Cf. Certain Underwriters*, 500 F.3d at 581, n.9 (rejecting defendant's suggestion that the court "treat a case falling within the Convention as we would treat any domestic case under the FAA"). Moreover, it would put the cart before the horse to apply federal common law based on a contract that plaintiffs say they never intended to enter with defendants. Whereas *Certain Underwriters* addressed which law should apply to interpret the substantive terms of an agreement where everyone agreed the dispute was arbitrable, 500 F.3d at 577, here the Court is dealing with the threshold inquiry of whether defendants can compel plaintiffs to arbitrate under the agreement in the first place. *See Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, 2022 WL 2643936, at *5–*6 (11th Cir. July 8, 2022) (Tjoflat, J., concurring) (distinguishing between the substantive arbitration issues for which a choice-of-law provision applies and "the threshold inquiry of arbitrability").

Even if there were a uniquely federal interest at play here, federal common law would only apply where "a significant conflict exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." *Certain Underwriters*, 500 F.3d at 579 (cleaned up) (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988)); *see also id.* (stating that a uniquely federal interest "merely establishes a necessary, not a sufficient, condition for the displacement of state law") (quoting *Boyle*, 487 U.S. at 507). This condition was met in *Certain Underwriters* because applying state law to extend arbitration deadlines on state and federal holidays

"would frustrate one of the primary objectives of the United States in becoming a signatory to the Convention: securing uniform standards by which agreements to arbitrate international disputes are governed." *Id.* at 580. In Illinois, for example, the deadline would extend on Casimir Pulaski Day, whereas in Hawaii the deadline would extend on Prince Jonah Kuhio Kalanianaole Day and King Kamehameha I Day. *See id.* at 580 n.8. Here, by contrast, defendants have not identified any similar conflict among state equitable-estoppel principles that would promote non-uniform results when applying state law.

At bottom, without a clearer instruction from the Seventh Circuit to do so, the Court will not depart from the "fundamental principle" that a "nonparty's right to enforce an arbitration agreement is governed by state law." *Sosa*, 8 F.4th at 637; *but see Patterson*, 710 F. Supp. 3d at 709; *Outokumpu*, 2022 WL 2643936, at *5–*6 (Tjoflat, J., concurring). In the Court's estimation, *Certain Underwriters* includes no such directive.

That leads to the next question—which state's law applies? Plaintiffs argue that Illinois law applies based on the most-significant-relationship test. [84] at 17. Defendants suggest that Singaporean law governs based on the choice-of-law provision in the Anchor Protocol's terms of service. [91] at 11–12 n.10. Defendants do not offer any other explanation why the Court should rely on Singaporean law, and the Court sees a host of reasons why it shouldn't. First, the language in the terms of service indicates that Singaporean law applies to the arbitral proceedings, but here the parties are still resolving a preliminary dispute over arbitrability. *See* [83-1] at

12 (saying that "[t]he applicable law shall be Singapore law" in the course of describing the arbitral proceedings); *see also Outokumpu*, 2022 WL 2643936, at *5–*6 (declining to apply substantive choice-of-law provision to threshold arbitrability question). And, to the extent the Anchor Protocol's terms of service identify Singaporean law as the governing law across the board, that provision only applies to "any Dispute between you and *us*"—meaning plaintiffs and TFL. *Id.* at 13; *see supra* at n.5; *c.f. Credit One Bank*, 885 F.3d at 1063 n.14 (declining to apply agreement's choice-of-law provision because "choice-of-law clauses in contracts do not apply to non-parties"); *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996) (same).

Lastly, even if it were proper to apply Singaporean law, it is defendants' burden—as the party seeking to compel arbitration—to establish that there is an outcome-determinative difference between Illinois and Singaporean law. *See Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (2014) ("The party seeking the choice-of-law determination bears the burden of demonstrating a conflict."); *see also id.* ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome.") (cleaned up). Defendants have not done so here, so the Court will apply Illinois law.[8] *See Sosa*, 8 F.4th at 634 (district court "properly applied Illinois law" because defendant "never suggested any difference between Illinois and Washington law").

[8] In a footnote of their reply brief, defendants "request the opportunity to brief whether Singaporean law would permit them to compel arbitration as non-signatories." [91] at 11–12 n.10. But the proper time to brief this issue was in defendants' motion to compel arbitration (and their subsequently filed reply). The opportunity to explain why Singaporean law would compel a different outcome has passed.

**C. Defendants Cannot Compel Arbitration.**

The default rule in Illinois is that a "nonsignatory typically has no right to invoke an arbitration provision contained in that contract." *Sosa*, 8 F.4th at 639. "But there are recognized exceptions to that general rule." *Id.* For example, a non-signatory might invoke an arbitration provision under a third-party beneficiary, agency, or equitable estoppel theory. *Id.*

Defendants do not attempt to show that *any* state's equitable estoppel principles would enable it to compel arbitration as a non-signatory, let alone Illinois'. Instead, they argue that federal common law principles warrant compelling plaintiffs to arbitrate. [82] at 23–24. Their failure to analyze the issue under state law is fatal to their motion to compel because "[t]he party claiming [equitable] estoppel has the burden of proving it by clear and convincing evidence." *Sosa*, 8 F.4th at 641.

Regardless, plaintiffs have demonstrated why defendants cannot rely on Illinois law. To bring a claim for equitable estoppel, a party "must have relied upon the acts or representations of the other and have had no knowledge or convenient means of knowing the facts, and such reliance must have been reasonable." *Id.* (quoting *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 514 (2004)). Here, like in *Sosa*, defendants have not identified any representation that plaintiffs made to defendants to induce them to rely on the agreement's arbitration provision. *Id.*

Because defendants have not established their right to compel arbitration as non-signatories, this dispute belongs in federal court.

## CONCLUSION

For the reasons discussed, defendants' motion to compel [82] is denied. By 5/23/25, the parties are directed to enter a joint status report with anticipated next steps in the case, including, if applicable, a proposed briefing schedule on any potential motion to dismiss. [76]. The Court sets a status hearing in this matter on 5/28/25 at 9:30 a.m.

Georgia N. Alexakis
United States District Judge

Date: 5/9/25